130 P.3d 1106

**ROBERT COMSTOCK, LLC, an Idaho limited liability company; Comstock Investment Limited Partnership, an Idaho limited partnership; Robert S. Comstock, individually and as managing partner of Robert Comstock, LLC; and Bernice B. Comstock, individually, and as managing partner of Comstock Investment Limited Partnership, and as a member of Robert Comstock, LLC, and Comstock Properties, LLC, an Idaho limited liability company, Plaintiffs–Counterdefendants–Appellants,**

v.

**KEYBANK NATIONAL ASSOCIATION, Defendant–Counterclaimant–Respondent.**

Nos. 31265/31478.

Supreme Court of Idaho, Boise, January 2006 Term.

Feb. 23, 2006.

G. Scott Blaser, Salt Lake City, Utah; Meyer & Williams, P.C., Jackson, Wyoming; Ringert Clark, Chtd., Boise, for appellants. P. Richard Meyer argued. G. Scott Blaser appeared.

Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, for respondent. Bradley J. Williams argued. John C. Ward appeared.

SCHROEDER, Chief Justice.

Robert Comstock, LLC, et al. (Comstock) made claims against KeyBank National Association (KeyBank) for fraud, fraudulent concealment, breach of contract, and breach of the implied covenant of good faith and fair dealing. The district court granted summary judgment in favor of KeyBank on each of Comstock's claims and ordered foreclosure on real estate collateral Robert Comstock and his mother pledged in a loan agreement with KeyBank. Comstock appeals, seeking a reversal of the district court's order and a remand for trial on all of Comstock's claims.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Robert Comstock has been in the business of designing and selling a line of men's fashion clothing and outerwear for more than twenty years. In the late 1970s Comstock's company was known as Comstock Load, Inc. Comstock received his start-up capital from his father. From 1980 to 1992 Comstock

entered into lending relationships with SeaFirst, First Security Bank, and Chemical Bank. With each of these lending relationships the account was eventually transferred to the Special Assets/Credits Department. From 1994 to 1996 Comstock partnered with Sunkyong, but this partnership was not successful. In 1995–1996 Comstock entered into a lending relationship with KeyBank, which Comstock discontinued in 1997. That same year he reorganized his business as Robert Comstock Apparel, Inc., and partnered with Hartmarx, which also proved to be an unsuccessful partnership. In · 1998 Comstock formed a new entity called Robert Comstock, LLC, and once again approached KeyBank for financial backing.

On January 12, 1999 Comstock entered into a loan agreement with KeyBank and signed two promissory notes for $4.3 million: Promissory Note No. 9501 in the amount of $500,000; and Promissory Note No. 9502 in the amount of $3,800,000. Section 7.14 of that loan agreement contained a Release and Waiver of All Claims, which read:

> Borrower and Guarantors are aware that they may hereafter discover facts in addition to or different from those which they now know or believe to be true with respect to the subject matter of this Agreement, but it is the intention of Borrower and Guarantors to hereby fully, finally and forever release all Released Claims, *known or unknown, suspected and unsuspected, which do now exist, may exist in the future, or heretofore have existed* by Borrower and/or Guarantors against KeyBank and that the release and waiver provided for in this Agreement shall be and remain in full force and effect as a full and complete general release with respect to all Released Claims notwithstanding the discovery of or the existence of any such additional or different facts or any additional or different defects or damages of any kind.

(Emphasis added). The agreement contained restrictive covenants, including a borrowing base provision which limited the amount the bank would loan based upon a percentage of the current value of the eligible collateral in stocks and bonds, cash assets, and accounts receivable. The agreement also contained a fixed ratio covenant, which required Comstock to maintain an operating cash flow of not less than 1.2 to 1.0 times the amount to its fixed charges.

On July 9, 1999, Comstock entered into a second agreement with KeyBank. This agreement served to extend and consolidate the debt of the two prior promissory notes.

In July of 2000 Comstock requested a credit increase from $4.3 million to $4.9 million. Promissory Note No. 9504 was drawn up. Comstock signed it. KeyBank drafted a lending agreement but neither party signed it. During October of 2000 Comstock learned that the business would likely have a loss for the fiscal year ending December 21, 2000, which would not appear in the financial statements until well into 2001. Comstock informed Charles Hervey, a KeyBank vice president, of the projected loss and asked whether it would be treated as a default. According to the evidence that must be accepted for purposes of this review, Hervey indicated that any default would be waived and the line of credit extended on the condition that the loss be restored. Similar statements were made by Ms. Larabee, a KeyBank senior vice president, who stated that replacement of the loss would make "a significant difference."

From June 2000 to August 2001 Comstock repeatedly asked for an increase in the line of credit, and KeyBank repeatedly refused. On March 16, 2001, at Comstock's annual loan review meeting, Comstock requested an increase from $4.9 million to $6.7 million, which KeyBank representatives said the Bank did not want to do. On May 17, 2001, in a letter to KeyBank, David Hurwitz, Comstock's CFO, asked for letters of credit to pay suppliers, which KeyBank refused to do. On May 23, 2001, Comstock's account was transferred to the Special Assets Department.

On July 16, 2001, Comstock and KeyBank entered into a Second Amended and Restated Loan Agreement and Forbearance from Foreclosure Agreement, which extended Comstock's current maturity date from July 2001 to January 15, 2002. This was followed by a Third Amended and Restated

Loan Agreement and then a Fourth Amended and Restated Loan Agreement. In May of 2002 Comstock negotiated and obtained accounts receivable financing from Production Finance International (PFI) for $1.3 million. Finally, on May 29, 2002, the parties entered into a final Fifth Amended and Restated Loan Agreement, which contained release provisions as did all the preceding loan agreements. This Fifth Agreement was evidenced by Note 9001, which was a term loan secured by real estate that Robert Comstock and his mother, Bernice Comstock, had pledged as collateral. Note 9001 was due on June 30, 2003, and the amount due on it was $1,471,578.97.

On June 10, 2003, Comstock filed a complaint against KeyBank, asserting claims for fraud, fraudulent concealment, breach of contract, and breach of the implied covenant of good faith and fair dealing. Comstock amended the complaint on June 25, 2003. On August 11, 2003, KeyBank filed an answer and counterclaim, seeking judgment against Comstock for the unpaid notes, and specifically for the foreclosure against the real estate collateral. KeyBank also moved for summary judgment. The district court granted KeyBank's motion for summary judgment and ordered foreclosure of the real estate collateral.

## II.

### STANDARD OF REVIEW

■■■ In an appeal from an order of summary judgment, this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. *Conway v. Sonntag,* 141 Idaho 144, 146, 106 P.3d 470, 472 (2005) (internal citations omitted). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id.* Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* If the

evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id.*

## III.

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT

Section 8.14 of the May 2002 Fifth Amended and Restated Loan Agreement contains the following release agreement:

> SECTION 8.14 RELEASE AND WAIVER OF ALL CLAIMS. BORROWERS AND GUARANTORS HEREBY UNCONDITIONALLY RELEASE AND FULLY, ABSOLUTELY AND FOREVER DISCHARGE KEYBANK, INDIVIDUALLY AND COLLECTIVELY, FROM ALL RELEASED CLAIMS ... *IT IS THE INTENTION OF BORROWERS AND GUARANTORS TO HEREBY FULLY, FINALLY AND FOREVER RELEASE ALL RELEASED CLAIMS, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, WHICH DO NOW EXIST, MAY EXIST IN THE FUTURE, OR HERETOFORE HAVE EXISTED* BY BORROWERS AND/OR GUARANTORS AGAINST KEYBANK AND THAT THE RELEASE AND WAIVER PROVIDED FOR IN THIS AGREEMENT SHALL BE AND REMAIN IN FULL FORCE AND EFFECT AS A FULL AND COMPLETE GENERAL RELEASE WITH RESPECT TO ALL RELEASED CLAIMS NOTWITHSTANDING THE DISCOVERY OF OR THE EXISTENCE OF ANY SUCH ADDITIONAL OR DIFFERENT FACTS OR ANY ADDITIONAL OR DIFFERENT DEFECTS OR DAMAGES OF ANY KIND.

(Emphasis added). This Court has addressed release agreements:

> A release is a type of contract, in which one party makes a "complete abandonment of [a] cause of action." Because "[t]here is an obvious public policy favoring the amicable settlement of litigation, ... agreements accomplishing this result

will be disregarded only for the strongest of reasons." Furthermore, such reasons must be shown by clear, satisfactory and convincing evidence.

*Lomas & Nettleton Co. v. Tiger Enterprises, Inc.*, 99 Idaho 539, 542, 585 P.2d 949, 952 (1978) (internal citations omitted). Additionally, this Court has also stated that:

"[A] general release ordinarily includes all claims and demands then due and within the contemplation of the parties," and "consequently a demand of which the parties were ignorant when the release was given is not as a rule embraced therein ... If, however, a demand falls within the fair terms of the release it is discharged thereby, whether or not it was contemplated by the parties, and whether or not they were aware of its existence."

. . .

"[I]n the absence of fraud in obtaining such general release, it will be sustained, even though the parties did not have in mind the alleged wrongs complained of, or which were not disclosed or known when the release was signed."

*Heath v. Utah Home Fire Ins. Co.*, 89 Idaho 490, 495–96, 406 P.2d 341, 343–44 (1965) (internal citations omitted).

### A. The claim of fraud.

Comstock maintains that the May 2002 agreement containing the release provisions was obtained through fraud and economic duress. The fraud claim is based on a change to the Intercreditor Agreement (ICA) providing that Comstock would not directly receive the cash proceeds from inventory financed by Production Finance International (PFI). Instead the cash proceeds from PFI would go directly to KeyBank. Comstock asserts that he was unaware of this change and that he only received a copy of this agreement by email transmission after he executed the Fifth Amended and Restated Loan Agreement.

Comstock testified in his deposition that he would have declared bankruptcy if he had known of the change. In his affidavit he stated:

The decision to proceed with KeyBank and execute the May 2002 agreement, 5th Agreement, would never have been made and this agreement would never have been signed by plaintiffs if Comstock LLC or I had known of the substitution of the page in the PFI agreement at the request of KeyBank. Contrary to the negotiations, which had been held between Comstock LLC and KeyBank, the change provided that PFI's funds would go directly to Key-Bank. KeyBank refused to revert to the negotiated agreement and insisted that PFI funds be paid to it.

In evaluating claims of fraud this Court has stated the following in *West v. Prater*, 57 Idaho 583, 587–88, 67 P.2d 273, 277–78 (1937) (internal citations omitted):

In order to relieve one from responsibility for a contract on the grounds that he was induced to sign it by false representations, it must be shown that the representations were false and fraudulent and such as would be likely to deceive a person of ordinary prudence. "Fraud which would relieve a party who can read must be fraud which prevents him from reading."

On the other hand, voluntary "failure or inability of party to read written contract before signing it is not ground for setting it aside." "One may be, and it sometimes happens that he is, estopped by his own negligence to deny liability on a written instrument signed by him without having read it. This is true where he had opportunity to read the document and was not fraudulently dissuaded or prevented from reading it."

There are two copies of the ICA in the record: (1) the unchanged, unsigned copy dated 5/14/02 attached to the May 2002 loan agreement which directs cash received pursuant to the financing agreement with PFI go directly to Comstock; (2) the changed, signed copy revised 5/22/02 which directs cash received pursuant to the financing agreement with PFI go directly to KeyBank. It is the latter revised copy which Comstock signed. It is a redlined copy which clearly shows the change in payments from PFI directly to KeyBank. Comstock apparently did not read what he was signing. There is nothing in the record to indicate that Key-

Bank prevented him from doing so. Comstock's argument for fraud lacks merit.

 Comstock argues that he signed the May 2002 Fifth Agreement under economic duress as a result of KeyBank's misconduct which caused him financial difficulties. This is not designated as an issue on appeal but is also encompassed in the claim of fraud. The claim as articulated is based upon the alleged breach of prior commitments which created severe financial difficulty. The Fifth Agreement contained a release of such claims. Those claims, including the alleged misrepresentations of Hervey, Larabee and the failure to issue letters of credit were all known at the time the Fifth Agreement was executed. If Comstock had claims, he needed to address them, not waive them.

The record shows that KeyBank continuously tried to work with Comstock. As an alternative to the *Fifth* Amended and Restated Loan Agreement, KeyBank could have stopped working with Comstock before it entered into the *Second, Third,* or even *Fourth* Amended and Restated Loan and Forebearance from Foreclosure Agreements. To the extent Comstock makes a claim of economic duress, the claim is not supported by the record.

### B. KeyBank entitled to attorney fees on appeal.

In accordance with the attorney fee provisions in each of the loan agreements Comstock signed with KeyBank, KeyBank is entitled to attorney fees on appeal.

## IV.

## CONCLUSION

The district court's entry of summary judgment in favor of KeyBank is affirmed. KeyBank is awarded costs and attorney fees.

Justices EISMANN, BURDICK and JONES and Justice Pro Tem JUDD concur.