# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 32500

|  |  |
|---|---|
| WILLIAM SHANE MCKINLEY,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>GUARANTY NATIONAL INSURANCE COMPANY, a foreign company/entity,<br><br>    Defendant-Respondent. | Boise, March 2007 Term<br><br>2007 Opinion No. 72<br><br>Filed: May 3, 2007<br><br>Stephen W. Kenyon, Clerk |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, for the County of Bonneville. Hon. Jon J. Shindurling, District Judge.

District court's order granting summary judgment is <u>affirmed</u> in part and <u>vacated</u> in part and the case is remanded.

Pedersen and Jackson, Twin Falls, for appellant. Kenneth L. Pedersen argued.

Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Pocatello, for respondent. Gary T. Dance argued.

————————————

JONES, Justice

After an automobile accident and subsequent personal injury judgment against him that exceeded his policy limits, Shane McKinley, the appellant, sued his insurer, Guaranty National Insurance Company ("GNIC"). His claims included bad faith in handling the personal injury claim, breach of contract and intentional infliction of emotional distress (IIED). The district court granted summary judgment for GNIC on all claims. We vacate the grant of summary judgment on the bad faith claim but affirm on the breach of contract and IIED claims.

1

## I.

On October 27, 2000, McKinley was involved in a multi-vehicle accident with a Ford Taurus and a Chevrolet pickup. Charlotte Hansen and her passenger Mari Ann Dyet were in the Taurus, while Russell and Melissa Taylor were in the pickup. At the time, McKinley maintained an automobile insurance policy through GNIC, which limited bodily injury coverage to $25,000 per person and $50,000 per accident. On October 30 GNIC assigned an adjuster, David Almond, to handle the claims against McKinley. Upon receiving the case, Almond attempted to call McKinley at the Idaho Falls number shown on his policy, but got no answer. Almond called again on October 31 and spoke with a woman who gave him an address and phone number in Rigby where McKinley was residing while recovering. Almond called on November 2 but received no answer.

Almond received a telephone call from Melissa Taylor on November 6, and was informed that Russell Taylor had experienced some shoulder pain as a result of the accident while she had a bruised kidney and lower back pain. Mrs. Taylor advised Almond that the passenger in the Taurus "broke both hips" and the driver had sustained "severe injuries to the arm and had to have surgery." After that phone call, Almond tried to reach McKinley and spoke with McKinley's sister, who said she would have McKinley call the next day.

Almond tried to call McKinley on November 7 but got no answer. He also sent two letters to McKinley – one advising him that GNIC was having trouble contacting him and that he needed to pay attention to the matter and the other advising him of his policy limits and that he may be exposed to liability in excess of those limits. Both letters were sent to the Idaho Falls address on the policy, rather than the Rigby address he was given on October 31. On November 8, a GNIC employee identified in the McKinley insurance file as RSK, spoke with McKinley's mother, who instructed RSK to call McKinley on his cell phone. RSK dialed the cell phone and left a voicemail. On November 17 Almond received a voicemail from a person calling on McKinley's behalf, and that same day, he called both McKinley's home phone and cell phone, leaving messages. Almond also sent a letter to McKinley urging that he call him.

On November 22 Michael McBride, an attorney representing Dyet and Hansen, wrote to Almond stating that Dyet had "sustained bilateral fractures to her hips and is

2

currently wheelchair bound." He enclosed a medical bill in the amount of $69,179.43, speculated that the GNIC policy limits were probably $25,000/$50,000, and requested that the actual limits be disclosed. Almond received the letter on November 27 and RSK tried to reach McKinley the following day but spoke with a woman who informed RSK that McKinley was working on paperwork related to the accident. Almond received the accident report on December 4. Almond called McBride's office that day and spoke with an assistant who provided some details regarding Dyet's and Hansen's injuries. McBride's office also provided the name and telephone number of the adjuster handling Dyet's medical insurance claim. Almond called that adjuster who informed him that Dyet's and Hansen's injuries were serious.

McBride sent a letter to Almond on December 11, suggesting that GNIC make an offer to resolve Dyet's claim for the $25,000 policy limit. McBride wrote Almond again on December 27, enclosing Dyet's medical records and demanding that it tender the $25,000 policy limit to settle Dyet's claim. The letter stated, in part, "We provide you this one and sole opportunity to protect your insured by tendering that sum." The letter set a deadline of January 12, 2001 for a response. GNIC received the letter on January 2, though Almond claimed that he did not see it until January 9. He also attempted to contact GNIC's attorney, Gary Cooper, to discuss the letter. In his file notes Almond indicated that he was "not comfortable" in tendering limits yet because he did not know the extent of the other pending claims against McKinley.

Cooper called McBride's office on January 12 to obtain an extension of the deadline but, because McBride was not in, he left a message asking McBride to return his call. That same day Cooper sent a letter to McBride stating that GNIC was not refusing to settle Dyet's claim and that GNIC still needed to investigate the three other claims, which would require additional time. Cooper sent McKinley a copy of McBride's settlement demand on January 16, along with a letter advising him of the status of Almond's investigation and recommending that he seek legal counsel. McBride wrote Cooper on January 24, stating that he would not allow any additional time. On February 8 Almond authorized Cooper to settle with Dyet for $25,000, and Cooper conveyed that offer to McBride. Cooper sent a copy of the settlement offer to McKinley, along with a letter outlining the Dyet and Hansen claims and again recommending that he seek legal

3

advice. Dyet rejected GNIC's February 8 settlement offer and filed suit against McKinley. In April 2001 GNIC informed McKinley that it could not resolve Dyet's claim. The case proceeded to trial and the district court entered judgment against McKinley for $284,334.78. *See Dyet v. McKinley*, 139 Idaho 526, 81 P.3d 1236 (2003).

In the present lawsuit the district court found that no genuine issues of material fact existed on the bad faith claim, concluding that GNIC reasonably investigated the claims against McKinley and communicated appropriately with him. The district court also granted summary judgment on McKinley's other claims, finding that GNIC did not breach any contractual obligation owed to him and that GNIC had not acted intentionally, recklessly or outrageously.

## II.

When reviewing an order for summary judgment, the standard of review for this Court is the same standard used by the district court in ruling on the motion. *Watson v. Weick*, 141 Idaho 500, 504, 112 P.3d 788, 792 (2005). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Idaho R. Civ. P. 56(c). "All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party." *Robert Comstock, LLC v. Keybank Natl. Assn.*, 142 Idaho 568, 571, 130 P.3d 1106, 1109 (2006). If there is no genuine issue of material fact "only a question of law remains, over which this Court exercises free review." *Watson*, 141 Idaho at 504, 112 P.3d at 792.

## A.

In a so-called third party bad faith action "[a]n insurer is under a duty to exercise good faith in considering offers to compromise an injured party's claim against the insured for an amount within the insured's policy limits." *Truck Ins. Exch. v. Bishara*, 128 Idaho 550, 553, 916 P.2d 1275, 1278 (1996) (citing *Openshaw v. Allstate Ins. Co.*, 94 Idaho 192, 194, 484 P.2d 1032, 1034 (1971)). The insured can bring an independent action in tort for the insurer's bad faith in unreasonably denying or unreasonably delaying settlement of the claim. *Robinson v. State Farm Mut. Automobile Ins. Co.*, 137 Idaho

4

173, 178, 45 P.3d 829, 834 (2002). Bad faith covers both intentional and negligent denials or delays in paying insurance claims. *Reynolds v. American Hardware Mut. Ins. Co.*, 115 Idaho 362, 365, 766 P.2d 1243, 1246 (1988).

In *Bishara* we adopted the "equality of consideration" standard to determine whether an insurer acted in bad faith in failing to settle a claim against its insured. 128 Idaho at 554, 916 P.2d at 1279. Under this standard the trier of fact considers seven factors with emphasis on two: 1) "whether the insurer has failed to communicate with the insured, including particularly informing the insured of any compromise offers," and 2) "the amount of financial risk to which each of the parties will be exposed in the event an offer is refused." *Id.* at 555, 916 P.2d at 1280. The other five factors to be considered are:

> the strength of the injured claimant's case on the issues of liability and damages; whether the insurer has thoroughly investigated the claim; the failure of the insurer to follow the legal advice of its own attorney; any misrepresentations by the insured which have misled the insurer in its settlement negotiations; and any other factors which may weigh toward establishing or negating the bad faith of the insurer.

*Id.* Summary judgment is proper "only if there are no disputed issues of fact as to these considerations." *Id.* at 559, 916 P.2d at 1284.

Summary judgment is inappropriate here because genuine issues of material fact exist. The district court concluded that GNIC properly considered the financial risk to McKinley, reasonably investigated the claims, and communicated Dyet's settlement offer to McKinley. However, even though GNIC points to facts in the records supporting each of these conclusions, McKinley points to facts that place each conclusion in dispute, making it inappropriate to determine the matter on summary judgment.

The financial risk factor "requires a determination of the impact on the relative financial well being of each of the parties should settlement not be successful." *Id.* at 555, 916 P.2d at 1280. At the outset, it should be observed that McKinley placed himself at some risk by purchasing a policy that provided only the minimum liability coverage required by law. Idaho Code §§ 49-1229(1) and 49-117(18). Thus, a serious accident, like the one involved here, was likely to place him in personal financial jeopardy. Indeed, it was fairly obvious by November 27, when Almond learned that the injuries suffered by Dyet and Hansen were serious and that Dyet's medical bill already exceeded

5

$69,000, that McKinley was at substantial risk. Almond had attempted to alert McKinley of this potential risk in his November 7 letter to McKinley's Idaho Falls address. GNIC could have assumed that it was facing payment of the full $50,000 limit regardless of what happened. It knew enough, also, to reasonably conclude that McKinley's risk could be substantially greater. Consideration of this factor would tend to emphasize the need to investigate and evaluate the outstanding claims against McKinley in a timely manner.

We stated in *Bishara* that, "In order to avoid liability for bad faith when the insured's potential liability is in excess of the policy limits the insurer, at a minimum, should make a diligent effort to ascertain the facts, communicate the results of such investigation to the insured 'and must inform him of any settlement offers that may affect him, so that the insured may take proper steps to protect his own interests.'" *Id.* at 555, 916 P.2d at 1280 (quoting *Ivy v. Pacific Automobile Ins. Co.*, 320 P.2d 140, 146 (Cal. App. 1958)). As McKinley points out, GNIC could have pursued a more vigorous investigation of the potential claims, especially in light of Melissa Taylor's phone call to Almond on November 6 within ten days of the accident. Taylor alerted Almond that Dyet and Hansen had suffered serious injuries, while she and her husband had sustained apparently light injuries. It would be reasonable to infer, based on this information, that GNIC needed to increase the tempo of the investigation, particularly with respect to determining the magnitude of the Dyet and Hansen claims.

GNIC correctly points out that McKinley was not particularly helpful in cooperating with the investigation. On the other hand, GNIC had the contractual authority to settle within policy limits without obtaining McKinley's approval. And, Almond had been in contact with Melissa Taylor on November 6 and had received information on November 27 verifying her report that the occupants of the Taurus had sustained serious injuries. That, combined with McBride's hint on December 11 that Dyet would settle for the $25,000 policy limit, would provide further support for an inference that GNIC should have made efforts to expedite the investigation and settlement process.

Because McKinley faced exposure above the policy limits, GNIC could have done a better job of keeping him informed of settlement communications. GNIC asserts that it acted reasonably in communicating with McBride and that it informed McKinley

6

of what was happening. *Bishara* requires consideration of whether GNIC spoke with its insured, not the injured party, about settlement offers. 128 Idaho at 555, 916 P.2d at 1280. We noted in *Bishara* as well that the insured must be informed of settlement offers so that the insured can take steps to protect his interests, which includes guarding against an excess judgment.[1] *Id.* Failing to inform the insured of any settlement offers does not make the insurance company liable for bad faith in and of itself as it is one factor to be considered in applying the equality of consideration test. *Id.* While GNIC informed McKinley as early as November 7 that he faced the possibility of an excess judgment, it failed to keep him advised of the settlement overtures begun by McBride on December 11, or of the fact that Dyet's claim substantially exceeded the $25,000 policy limit, until after the expiration of McBride's demand deadline. GNIC received McBride's settlement demand, with the January 12 deadline, on January 2, but did not advise McKinley of the demand until January 16.

GNIC argues that Dyet's attorney unilaterally set an unreasonable timetable for settlement, designed to manufacture a bad faith claim. However, GNIC was unable at the oral argument of this case to point to any evidence in the record supporting the contention that McBride was trying to manufacture a bad faith claim. Without evidence to support a claim that McBride was acting improperly, we will not infer this to be the case. Indeed, it would be just as easy to infer that McBride had determined it would be best to get a quick policy-limits settlement for Dyet, instead of going to the time and expense of pursuing a suit against McKinley and then trying to collect on it. Without evidentiary support for either inference, we decline to speculate what McBride's motives may have been. And, even if there were evidence that McBride had impure motives, it is not clear why it would be appropriate on summary judgment to draw inferences against the non-moving party based upon actions or motives of the attorney of a non-party. Further, we are not prepared at this time to hold that the motives of a party would be relevant to our analysis.

---

[1] In *Bishara* we denoted the duty to communicate offers as "[f]irst and foremost" of the seven factors. *Id.* The factor should not be divorced from the reason for its inclusion. It is not entitled to much weight in the analysis unless the insured establishes that, had he been informed of a settlement offer, he could have taken proper steps to protect his own interests. In this case, it assumes lesser importance for two reasons. First, GNIC did not need McKinley's approval to settle the claims within policy limits and, second, there is no evidence in the record as to actions that McKinley could have taken to protect himself (other than obtaining advice from personal counsel, which GNIC advised him to do early on and which he failed to do), had he been kept abreast of settlement communications.

7

GNIC is correct that it had a right and an obligation to investigate all potential claims before settling. GNIC asserts that where policy limits are implicated it should not indiscriminately or precipitously settle one claim out of several, citing *Shuster v. S. Broward Hosp. Dist. Phys. Prof. Liab. Ins. Trust*, 591 So. 2d 174, 177 (Fla. 1992), for the proposition that an insurer may be liable for bad faith if it "indiscriminately settles with one or more of the parties for the full policy limits, thus exposing the insured to an excess judgment from the remaining parties." GNIC asserts, further, that an insurer does not necessarily act in bad faith by allowing a settlement deadline to expire. *See, e.g. Miel v. State Farm Mut. Automobile Ins. Co.*, 912 P.2d 1333, 1339 (Ariz. App. 1995). Here, however, even though the demand deadline may have been somewhat arbitrary, it did pose a risk to McKinley. GNIC arguably had adequate time, without acting precipitously or indiscriminately, to investigate all claims and to communicate with its insured before Dyet's settlement deadline expired.

Summary judgment is inappropriate because GNIC's handling of McKinley's case raises disputed issues of material fact best resolved by the finder of fact. *See Shane v. Blair*, 139 Idaho 126, 131, 75 P.3d 180, 185 (2003).

**B.**

McKinley argues that GNIC breached a contractual duty imposed by law to settle within policy limits. An insured may also pursue a breach of contract action against an insurer for failing to settle a claim in violation of the terms of the insurance contract. *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 97, 730 P.2d 1014, 1017 (1986) (quoting *Anderson v. Contl. Ins. Co.*, 271 N.W.2d 368, 374 (Wis. 1978): "the bad faith conduct by one party to a contract toward another is a tort separate and apart from a breach of contract per se and…damages may be recovered for the tort and for the contract breach"). In a first party action we have held that an insured should recover first in contract and then in tort if "the resulting harm was not fully compensable by contract damages." *Robinson*, 137 Idaho at 178, 45 P.3d at 834. This logic is equally sound for third party actions.

In this case, though, GNIC has already paid out the $50,000 available under the policy and thus summary judgment is appropriate with respect to the contract claim because no remedy is available to McKinley. In a third party action where the insurer

8

unreasonably denies a settlement or payment, the insured would be able to recover contract damages up to the policy limits and then tort damages for any excess. For a cause of action based on delay and not denial, however, the insurer has already paid the policy limits and, therefore, contract damages are unavailable. McKinley's independent contract cause of action cannot survive summary judgment because no genuine issue of material fact exists that he is not entitled to contract damages. *General Auto Parts Co., Inc. v. Genuine Parts Co.*, 132 Idaho 849, 859, 979 P.2d 1207, 1217 (1999) ("damages must be proven with reasonable certainty" in breach of contract action).

## C.

McKinley argues that sufficient facts were in dispute for his IIED claim to survive summary judgment. To prove IIED the plaintiff must prove four elements: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." *Est. of Becker v. Callahan*, 140 Idaho 522, 527, 96 P.3d 623, 628 (2004). The district court acts as a gatekeeper for IIED claims, weeding out weak causes of action. *See Edmondson v. Shearer Lumber Prods.*, 139 Idaho 172, 180, 75 P.3d 733, 741 (2003) ("It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery," quoting Restatement (Second) of Torts § 46, cmt. h (1965)). If reasonable minds could differ on whether the defendant's conduct was extreme or outrageous, then the IIED claim should proceed to a jury. *Id.* The district court may properly grant summary judgment however "when the facts allege conduct of the defendant that could not reasonably be regarded as so extreme and outrageous as to permit recovery for intentional or reckless infliction of emotional distress." *Id.*

The record does not show that GNIC acted intentionally or recklessly in carrying out its investigation. GNIC faced multiple claims, needed time to investigate and did seek to settle within four months of the accident. GNIC requested an extension from Dyet's attorney, explaining that it needed more time to investigate the other claims. While it could have acted more expeditiously under the particular facts of this case, its conduct was not reckless. The defendant's conduct should also "rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average

9

member of the community to believe it was 'outrageous.'" *Id.* We have previously said that a jury could find such conduct where an insurer "denied coverage on a specious theory involving an interpretation of the term 'treatment' that would exclude coverage for anybody who had check-ups following an incident of cancer." *Walston v. Monumental Life Ins. Co.*, 129 Idaho 211, 220, 923 P.2d 456, 465 (1996). Here, GNIC's conduct was not beyond the bounds of decency and summary judgment was appropriate. *See Est. of Becker*, 140 Idaho at 527, 96 P.3d at 628 ("even if Callahan's conduct may not have been the most appropriate way to draft and execute the will, nothing in his conduct rises to the level of 'atrocious' or 'beyond all possible bounds of decency'").

## III.

We vacate the district court's grant of summary judgment on the bad faith claim and remand for proceedings consistent with this opinion. We affirm the grant of summary judgment on the breach of contract and IIED claims. No costs awarded.

Chief Justice SCHROEDER, and Justices TROUT, EISMANN and BURDICK CONCUR.