112 P.3d 788

Rocky WATSON and Mary Watson, husband and wife, Plaintiffs–Counterdefendants–Respondents,

v.

John WEICK and Julie Weick, Defendants–Counterclaimants–Appellants.

No. 30475.

Supreme Court of Idaho, Boise, April 2005 Term.

April 29, 2005.

502

Ramsden & Lyons and Stephen B. McCrea, Coeur d'Alene, for appellants. Michael E. Ramsden argued.

Witherspoon, Kelley, Davenport & Toole, Coeur d'Alene, for respondents. Joel P. Hazel argued.

EISMANN, Justice.

This is an appeal from a grant of summary judgment dismissing claims for fraud and breach of contract arising out of the sale of a business. We hold that the district court misapplied *Faw v. Greenwood*, 101 Idaho 387, 613 P.2d 1338 (1980), in dismissing the claim for fraud and erred in dismissing one of the claims for breach of contract. We uphold the grant of summary judgment on the remaining claims, vacate the judgment, and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

This lawsuit arises from the sale by the plaintiffs-respondents Rocky and Mary Watson of their security business to the defendants-appellants John and Julie Weick. The parties structured the transaction as a sale of the Watsons' stock in Watson Agency, Inc., two ancillary corporations, and a parcel of real property. On October 31, 2001, they executed a written contract (Agreement) setting forth the terms of the transaction. The Agreement stated that the sale price of the stock in the three corporations was $1.15 million dollars, which the Weicks were to pay by delivering at closing: $195,000 in cash, $800,000 by certified check, $110,000 by a promissory note payable to the Watsons, and $45,000 by a second promissory note payable to the Watsons. The Weicks were also to pay at closing $277,000 in cash or cashier's check for the real property. The parties contemplated that the $800,000 payment was to come from a bank loan. The Agreement provided that the closing was to occur on October 31, 2001, but it did not occur then

because the Weicks' bank loan had not yet funded.

The parties rescheduled the closing of the transaction to November 28, 2001. On that date, they appeared at the office of the closing agent and signed the documents necessary to consummate the sale. The documents signed included both promissory notes, the Watsons' resignation of their positions as officers and directors of the corporation, minutes of special meetings of the shareholders electing the Weicks as directors, and minutes of special meetings of the directors electing John Weick as president and Julie Weick as vice-president and secretary. The closing was not completed on November 28, 2001, however, because the Weicks' bank loan had still not funded. It did so in mid-December, and the closing was completed on December 15 or 17, 2001.

On November 2, 2002, the Watsons filed this action seeking to recover on the $110,000 promissory note. The Weicks initially responded by a letter from their counsel [1] stating that they wanted to rescind the transaction and were tendering their resignations from the boards of directors, their stock in the three corporations, and deeds to the real property. The Watsons did not accept the offer to rescind the transaction. On November 22, 2002, the Weicks filed an answer and a counterclaim in which they alleged fraud and breach of contract and sought rescission of the transaction or, alternatively, an award of damages. On January 8, 2003, the Watsons filed an amended complaint adding a claim to recover on the $45,000 promissory note. Although the principal and interest on that note was not due until October 31, 2006, they alleged that the Weicks had committed an anticipatory breach of the note.

After granting the Watsons' motions for summary judgment, the district court entered a judgment dismissing the Weicks' counterclaims and awarding the Watsons a judgment in the sum of $228,192.83, which included costs and attorney fees totaling $58,592.87. The Weicks then timely appealed.

1. The Weicks have different counsel on appeal.

## II. ISSUES ON APPEAL

A. Did the district court err in granting summary judgment dismissing the Weicks' claim for fraud?

B. Did the district court err in dismissing the Weicks' claim for rescission?

C. Did the district court err in dismissing the Weicks' claims for breach of contract?

D. Did the district court abuse its discretion in its award of attorney fees, and is either party entitled to an award of attorney fees on appeal?

## III. ANALYSIS

In an appeal from an order of summary judgment, this Court's standard of review is the same as the standard used by the trial court in ruling on a motion for summary judgment. *Infanger v. City of Salmon*, 137 Idaho 45, 44 P.3d 1100 (2002). All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Id.* Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review. *Id.*

### A. Did the District Court Err in Granting Summary Judgment Dismissing the Weicks' Claim for Fraud?

The first issue we must address in connection with this assignment of error is whether we have jurisdiction to address it. This Court must address a question as to its jurisdiction even if not raised by the parties. *Diamond v. Sandpoint Title Ins., Inc.*, 132 Idaho 145, 968 P.2d 240 (1998).

The Watsons first moved for summary judgment on June 3, 2003. The district court heard the motion, and on July 31, 2003,

it entered an order granting partial summary judgment. In that order, the district court held that the Watsons were entitled to a judgment for the sums owing on the promissory notes, to the dismissal of the Weicks' counterclaim for fraud, and to the dismissal of any claim for breach of contract based upon conduct that occurred after November 28, 2001.

The order granting partial summary judgment included a provision stating, "Defendants' counterclaim for fraud is hereby dismissed with prejudice." At the end of that order, the district court included a Rule 54(b) certificate providing as follows, "I expressly find, pursuant to Idaho Rule of Civil Procedure 54(b), that there is no just reason for delay and expressly direct entry of judgment on Plaintiffs' action to enforce the two promissory notes consistent with this order." On October 2, 2003, the court entered a partial judgment in favor of the Watsons for the amounts owing on the promissory notes. That judgment did not include a Rule 54(b) certificate, nor did it mention the Weicks' counterclaim for fraud. The Weicks did not file their appeal until February 11, 2004. Therefore, if the Rule 54(b) certificate created a final partial judgment, we would not have jurisdiction to review that partial judgment.

■ The Rule 54(b) certificate was a nullity with respect to that portion of the order granting partial summary judgment on the Watsons' claim to collect on the promissory notes. Rule 54(b) only applies to a judgment or to an order that constitutes a judgment. An order simply granting a motion for summary judgment does not constitute a judgment. *Camp v. East Fork Ditch Co., Ltd.*, 137 Idaho 850, 55 P.3d 304 (2002). That portion of the order relating to the enforcement of the promissory notes did not purport to be a judgment. It simply granted the Watsons' motion for summary judgment on that claim. Thus, a Rule 54(b) certificate regarding the order granting summary judgment does not comply with Rule 54(b) and is of no effect.

The Rule 54(b) certificate at the end of the order granting partial summary judgment does not apply to the partial judgment later entered. Rule 54(b) provides that the certificate "shall immediately follow the court's signature on the judgment." Under that provision, a Rule 54(b) certificate in the order granting partial summary judgment cannot apply to the partial judgment later entered by the district court. There is an issue, however, of whether the Rule 54(b) certificate applies to that portion of the partial summary judgment dismissing the Weicks' counterclaim for fraud. That counterclaim was asserted as a defense to the Watsons' action to collect on the promissory notes.

■ An order dismissing a counterclaim can constitute a judgment. *Camp v. East Fork Ditch Co., Ltd.*, 137 Idaho 850, 55 P.3d 304 (2002). It is not clear, however, whether the district court intended that the Rule 54(b) certificate as to the "action to enforce the two promissory notes consistent with this order" also included the order dismissing the counterclaim for fraud. Regardless of whether or not it did, the order is not a final partial judgment.

■ A district court's determination that there is no just reason for delay in entering a final partial judgment is not binding on this Court when it appears that the district court abused its discretion in so finding. *Smith v. Whittier*, 107 Idaho 1106, 695 P.2d 1245 (1985). Rule 54(b) of the Idaho Rules of Civil Procedure provides in part, "If any parties to an action are entitled to judgments against each other such as on a claim and counterclaim ..., such judgments shall be offset against each other and a single judgment for the difference between the entitlements shall be entered in favor of the party entitled to the larger judgment." Where there is a claim and a counterclaim asserted by opposing parties, a district court should ordinarily await the determination of both parties' claims before seeking to enter a final judgment in favor of one party on its claim. *Joyce Livestock Co. v. Hulet*, 102 Idaho 129, 627 P.2d 308 (1981). There is nothing in the record indicating any hardship, injustice, or compelling reason why the partial summary judgment granted to the Watsons on their complaint should be final before the Weicks' counterclaims were deter-

mined. The district court abused its discretion in determining that there was no just reason for delay and that a final judgment should be entered. We therefore vacate the Rule 54(b) certificate and address the issue of whether the district court erred in dismissing the Weicks' counterclaim for fraud.

The primary business that the Weicks purchased from the Watsons was the Watson Agency, Inc. (Watson Agency). The other two corporations had minimal assets. Prior to the sale, the Watsons provided the Weicks with a one-page document summarizing the income and expenses for the Watson Agency during the years 1995 through 2000. For each of those years, the document listed the amounts for gross sales, direct costs, gross profit, total expenses for each of seven categories, and net profit. Over the six-year period, the document showed a net annual profit that averaged over $475,000. Conversely, the income tax return prepared after the Weicks purchased the Agency showed a net loss of $625 in 2001, not including depreciation.

In their counterclaim, the Weicks alleged that the Watsons committed fraud by providing financial data that "misrepresented the value of the corporation by misrepresenting the actual corporate expenses" and that "misstated the true financial condition of the company."[2] Relying upon *Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980), the district court dismissed the fraud claim on the ground that "Defendants' due diligence foreclosed any reasonable or actual reliance on any allegedly incorrect or fraudulent statements of the Plaintiffs." The district court erred in its application of *Faw v. Greenwood* because it failed to consider whether the books and records actually examined by the Weicks contained information that disclosed the inaccuracy of the alleged representations.

*Faw v. Greenwood* was an action for fraud against the sellers of a business that consisted of retail sales, service, and installation of various electrical supplies and appliances. Although the business had been in existence for only six months, the sellers represented that it produced a net annual profit of $26,000. Prior to closing the transaction, the purchasers examined some documents that were supposed to be "profit and loss" statements for the months of April and May of 1975. They were actually cash flow statements because they did not take into account decreases in inventory. The profit-and-loss statements showed a year-to-date net loss of $547.39 in April and $1,074.21 in May. The purchasers also knew that the business had only been in operation since November 1974. After operating the business for three months, the purchasers closed it down and then sued the sellers contending that they had been induced into purchasing the business based upon the sellers' fraudulent misrepresentation that it had a net annual profit of $26,000. The case was tried to the court, which found that the purchasers had failed to prove that they relied upon the representation as to the business's net annual profit. Because the purchasers knew that the business had been in existence for only six months, they were aware that the net profit figure of $26,000 was only an estimated projection. The purchasers had also examined the books and records, which showed a net loss of $1,074.21 for the last five of the six months the business was in operation. In upholding the decision of the district court, this Court stated, "[W]hen a purchaser is given the opportunity to conduct an independent investigation of the records and does so, it is generally held that he is not entitled to rely on an alleged misrepresentation of the seller." 101 Idaho at 389, 613 P.2d at 1340.

The evidence in the record shows that prior to the purchase, John Weick made numerous trips to Coeur d'Alene to investigate the Watson Agency. Weick was involved with John Pennington in a security company in Los Angeles, California. In June 2001 they traveled to Coeur d'Alene to investigate

---

**2.** In their brief on appeal, the Weicks allege that the Watsons committed fraud in other ways also. Fraud must be pled with particularity. *Estes v. Barry,* 132 Idaho 82, 967 P.2d 284 (1998); I.R.C.P. 9(b). These are the only two allegations in the counterclaim that could reasonably be construed as alleging fraud. Because the Weicks did not amend their counterclaim to include the other alleged instances of fraud, we will not consider them. *See VanVooren v. Astin,* No. 30628, 111 P.3d 125 (Idaho March 30, 2005).

purchasing the Watson Agency. During that trip, they reviewed a couple months of the Agency's check register and copies of its contracts, and they talked with the Agency's employees. In July 2001, Weick again returned to Coeur d'Alene, this time with his tax adviser. Although they could have looked at any records they desired, the tax advisor only reviewed a couple months of the check register and some of the Agency's contracts. He also created a spreadsheet using the information he reviewed. He informed Weick that the Watsons paid for a lot of personal items through the Agency and expressed concern that the Watsons used a line of credit on a regular basis to pay business expenses. The tax advisor also told Weick that he had not done a complete audit of the Agency. Over the next several months, Weick returned to Coeur d'Alene numerous times, spending a total of about thirty days at the Agency. During those trips, however, he did not conduct any further examination of the financial records.

One of the elements that must be proven in order to establish fraud is justifiable reliance upon a false statement or representation. *Lindberg v. Roseth,* 137 Idaho 222, 46 P.3d 518 (2002). "[W]hen a purchaser is given the opportunity to conduct an independent investigation of the records **and does so,** ... he is not entitled to rely on alleged misrepresentations of the seller." *Faw v. Greenwood,* 101 Idaho 387, 389, 613 P.2d 1338, 1340 (1980) (emphasis added). Because the investigation must foreclose actual reliance upon the alleged misrepresentation, the investigation actually made must be of records that would disclose the inaccuracy of the representation. It is not a defense that the party alleging fraud could have ascertained the truth by conducting a more thorough investigation. *Id.* The issue is not one of contributory negligence; it is whether the party relied upon his own investigation and judgment of records that accurately disclosed the relevant fact rather than upon the alleged misrepresentation.

The district court held that the Weicks could not establish justifiable reliance "because the undisputed facts establish that [they] conducted significant due diligence by inspecting the books, records and financial information of the Watson corporations before purchasing the companies." The district court did not make any analysis of the records actually reviewed by the Weicks and whether those records would have disclosed the falsity of the alleged misrepresentations. The examination of a couple months of check registers would not necessarily show the actual expenses of the Watson Agency. It would show expenses paid during those months, but it would not show either unpaid expenses or those that are not paid on a monthly basis. The district court erred in holding as a matter of law that the Weicks could not prove justifiable reliance. We therefore reverse the grant of summary judgment on the issue of fraud.

**B. Did the District Court Err in Dismissing the Weicks' Claim for Rescission?**

In their counterclaim, the Weicks requested that the transaction be rescinded. The district court granted summary judgment dismissing that claim on the grounds that: (1) the dismissal of the fraud claim eliminated the claim for rescission; (2) the Weicks did not make an adequate tender; and (3) the Weicks did not seek rescission promptly. We need only address the second ground.

A party seeking to rescind a transaction on the ground of fraud must restore or offer to restore the other party to the status quo before the contract was formed. *White v. Mock,* 140 Idaho 882, 104 P.3d 356 (2004); *Haener v. Albro,* 73 Idaho 250, 249 P.2d 919 (1952). In the letter seeking rescission, the Weicks' attorney made the following offer:

> My client seeks to rescind the contract of sale and promissory note and return the parties to their pre-sale status.
>
> To that end, we tender to you resignations from the Board of Directors, all stock in each of the companies which were subject to the purchase agreement referred to in the promissory note attached to your Complaint, to wit, The Watson Agency, Inc., Pacific Personnel, Inc., and Watson U.S. Phoenix Corporation, as well as deeds to the real property purchased concurrently.

This tender shall be in full satisfaction of the provisions of the contract and promissory note and would affect total rescission between the parties.

The tender made no mention of obligations incurred by the Watson Agency after the Weicks purchased it including a $150,000 liability to the IRS; 25 to 30 additional employees; a new office in Los Angeles; the purchase of 12 to 14 new vehicles; and the purchase of $10,000 to $15,000 in computers. Tendering back the corporation with those new liabilities did not constitute offering to restore the Watsons to the status quo before the Agreement was formed. The district court did not err in dismissing the claim for rescission.

## C. Did the District Court Err in Dismissing the Weicks' Claims for Breach of Contract?

The Weicks alleged in their counterclaim that the Watsons had violated several provisions of the Agreement.

**■ 1. Taxes allegedly owing to the state of Montana.** In Paragraph 1(h) of the Agreement, the Watsons represented that "all income taxes, unemployment, social security, . . . and all other taxes . . . levied, assessed or imposed upon [the Watson Agency] by . . . any state . . . have been duly paid; and that all income reports and/or other reports required by law or regulation have been duly filed." The Weicks contend that the Watsons violated this provision because as of October 31, 2001, the Watson Agency owed taxes to the state of Montana in the sum of $678.16. The Watsons' claim regarding the Montana tax liability is based upon a letter from the Montana Department of Revenue dated September 1, 2003. That letter shows sums allegedly due since March 31, 1999. The district court did not address this claim in its order granting summary judgment, undoubtedly because this issue is not raised in the Weicks' counterclaim. They apparently discovered this claim after they filed their counterclaim, but they did not amend their counterclaim to include it. Because the Weicks did not amend their counterclaim to include this claim, the district court did not err in failing to consider it. *See*

*VanVooren v. Astin,* No. 30628, 111 P.3d 125 (Idaho March 30, 2005).

**■ 2. Failure to make 401(k) contributions.** In Paragraph 5(*l*) of the Agreement, the Watsons agreed that, at the time of closing, to the best of Watson's knowledge, the Watson Agency has "complied with all obligations owed to employee benefit plans." In their counterclaim, the Weicks alleged that the Watsons violated this provision by failing to have the Watson Agency make the 401(k) contributions for its employees. In support of this claim, the Weicks presented an affidavit from a certified public accountant stating that the Watson Agency owed 401(k) contributions for the third quarter of 2001 in the sum of $18,605.53 and for two-thirds of the fourth quarter in the sum of $16,167.33. The district court held that the Weicks failed to show any damage resulting from this breach of the Agreement. We agree.

The Weicks contend that the Watson Agency was worth less than what they bargained for because of the failure to make the 401(k) contributions during the last two quarters of 2001. The Agreement executed on October 31, 2001, fixed the purchase price for the Watson Agency. The Watsons did not represent or warrant that all 401(k) contributions had been made as of that date. In addition, the Agreement did not contain any provision requiring an adjustment to the purchase price based upon subsequent events, such as the failure to pay the 401(k) contributions. Had the Watsons been required to pay the contributions personally, then their failure to do so would have damaged the Watson Agency. They were not personally obligated to make those payments, however. It was an obligation of the corporation. Although the value of the corporation is affected by the existence of that liability, it is not affected by the timing of when that liability is paid. There is no contention that the Agency incurred any interest or penalty for the failure to pay the contributions timely.

**■ 3. Failure to pay payroll taxes.** In Paragraph 5(*l*) of the Agreement, the Watsons agreed that, at the time of closing, to the best of Watson's knowledge, the Watson Agency has "complied with all federal

and state requirements with respect to [its] employees." In their counterclaim, the Weicks alleged that the Watson Agency had not paid payroll taxes as of the date of closing. It is undisputed that the Watson Agency did not pay its payroll taxes due on December 10, 2001 (for the period of November 16 through 30) and on December 25, 2001 (for the period of December 1 through 15) [3]. The district court held that because the Weicks became the sole officers, directors, and shareholders of the Watson Agency on November 28, 2001, the Watsons were not liable for the Agency's failure to make any payments due after that date. The district court erred in its analysis.

Under the Agreement, the Watsons agreed that "at the time of closing" the Watson Agency will have complied with all federal and state requirements with respect to its employees. The Agreement provided that the closing would occur on October 31, 2001, but it is undisputed that the closing did not occur on that date. The parties rescheduled the closing to November 28, 2001. On that date, they appeared at the office of the closing agent and signed the documents necessary to consummate the sale. Those documents included the Watsons' resignation of their positions as officers and directors of the corporation, minutes of special meetings of the shareholders electing the Weicks as directors, and minutes of special meetings of the directors electing John Weick as president and Julie Weick as vice-president and secretary. It is not clear in the record whether any of those documents were delivered to the parties on November 28, 2001. The Agreement provided that the Watsons' resignations were to be delivered at the time of the closing. In his deposition, John Weick testified that the closing was not completed until December 15 or 17, 2001, when the bank funded his loan and that the Watsons remained in control of the Agency until the closing was completed. Regardless of whether or not the documents signed by the

parties on November 28, 2001, were delivered to them on that date, in the Agreement the Watsons agreed that the Watson Agency will have complied with all federal and state requirements with respect to its employees "at the time of closing." Because there was evidence in the record that the closing was not completed until December 15 or 17, 2001, the district court erred in granting summary judgment on the basis that the minutes reflecting the election of the Weicks as directors and officers of the corporation were dated November 28, 2001. We therefore reverse the grant of summary judgment on this claim.[4]

■ 4. **Substantial change in the financial condition of the Watson Agency.** The Agreement contained two provisions regarding any change in the financial condition of the Watson Agency. In Paragraph 2(a) the Watsons represented and warranted that when the Agreement was signed on October 31, 2001, "there has been no "Substantial Change" in the financial condition of [the Watson Agency] since the 31st day of August, 2001." This provision then stated that any difference not in excess of $20,000 in assets or $20,000 in liabilities shall not be a substantial change, with certain exceptions not relevant to this appeal. In Paragraph 5(a) the Watsons represented that at the time of closing "[t]here will be no Substantial Change in the financial condition of [the Watson Agency] as set forth in its balance sheet since the date hereof, except such as may occur in the ordinary and regular conduct of its business." This clause also included another exception not relevant to this appeal. In their counterclaim, the Weicks alleged that there had been a substantial change in the financial condition of the Watson Agency in violation of both provisions of the Agreement.

Paragraphs 2(a) and 5(a) are separate provisions governing differing time periods. Paragraph 2(a) governs any substantial change from August 31 to October 31, 2001,

---

**3.** The parties have not addressed the issue of whether "all federal and state requirements" required payment of the withholding taxes at the time of closing even though they were not yet due.

**4.** The Watsons have not contended that there was no damage from the failure to pay the payroll taxes timely. The Watson Agency may have been assessed a penalty for failing to make the payments when due.

and Paragraph 5(a) governs any substantial change from October 31, 2001, to the date of closing. The Weicks have not argued on appeal that there was a change of more than $20,000 in the total assets or liabilities of the Watson Agency during the period from August 31 to October 31, 2001. Rather, their focus on appeal is upon Paragraph 5(a). In that paragraph, the Watsons represented that from October 31, 2001, to the date of closing there will be no substantial change in the financial condition of the Watson Agency "except such as may occur in the ordinary and regular conduct of its business." The Weicks rely upon the affidavit of a certified public accountant in support of the contention that such substantial change was shown.

That accountant listed five items that he found to constitute a substantial change. They were: (1) a refund of $13,691.60 owing to the federal government as a result of a billing error for the period from September through November 2001; (2) the state of Montana taxes due in the sum of $678.16; (3) the unpaid 401(k) contributions in the sum of $34,772.86; (4) a loss during the period of August 31 through November 30, 2001, in the sum of $56,344.73; and (5) depreciation for the year 2001 in the sum of $31,207.92. In his deposition, however, the accountant testified that all of those changes occurred in the ordinary and regular conduct of the Agency's business. Paragraph 5(a) excludes from its provision any changes that occur in the ordinary and regular conduct of the business. Therefore, the district court did not err in holding that the Weicks had failed to present evidence showing a violation of either Paragraph 2(a) or 5(a) of the Agreement. ·

■ **5. Failure to submit bidding documents to the federal government.** In their counterclaim, the Weicks alleged, "There were actions taken which had a material adverse affect on the business in contravention of Paragraph 2(c) of the contract in that Watson failed to submit qualifying documents which would enable the corporations to continue to bid upon contracts with the United States government." According to the Weicks, had the documents been submitted, the Watson Agency may have been placed on a list of those qualified to bid on government contracts, and had it been placed on that list it may have been permitted to submit a bid, and had it been permitted to bid it may have been awarded a contract. The Weicks did not offer any evidence regarding the chances of being placed on the list or, if that occurred, the chances of being offered an opportunity to bid. Regardless of the speculative nature of any damages, the failure to submit the required documents did not violate Paragraph 2(c) of the Agreement.

Paragraph 2(c) provides, "That to the best of Watson's knowledge, there has been no action taken, nor any meeting of the stockholders or Boards of Directors of [the Watson Agency], which would have a material adverse effect on the business of [the Watson Agency] except as may be contained in the minute books [the Watson Agency]." The failure to submit the documents to the federal government would not constitute "action taken" by the board of directors or by anyone else. The district court did not err in granting summary judgment dismissing this claim.

■ **6. Failure to deliver all books and records of the Watson Agency.** Paragraph 4(b) of the Agreement provides that at the time of closing the Watsons were to deliver to the Weicks "[t]he minute book, stock certificate and transfer book, corporate seal, together with all books of account, agreements, documents and all other instruments of, or relating to, [the Watson Agency]." In their counterclaim, the Weicks alleged that the Watsons had violated that provision of the Agreement. The district court granted summary judgment dismissing that claim because the Weicks failed to show any damage caused by the alleged failure to deliver all of the books and records.

On appeal, the Weicks contend that they showed damage in two ways. First, they argue, "[T]he lack of records documenting expenses would impair the Weicks ability to determine the financial condition of [the Watson Agency]." They rely upon the affidavit of John Weick who stated that there was no documentation supporting numerous expenses that had been paid by the Watson Agency during 2001. The missing documentation included credit card receipts and

requests by employees for expense reimbursements. He contended that without the supporting documentation for the payments, it is "impossible to make an accurate determination of the financial status of the corporation." There is no contention that the records were insufficient to file an income tax return for 2001. John Weick's desire to have more detailed information about the expenses paid by the Watson Agency prior to the closing is not a element of damage recoverable for the alleged failure to turn over the records he desired. The Weicks have not pointed to any evidence that the allegedly missing documents had been retained by the Watson Agency and were in existence at the time of closing.

 The other alleged damage is based upon the failure to turn over correspondence that Mary Watson had with the General Services Administration (GSA) during the second half of 2001. During 2001, the Watson Agency had contracts with the GSA, and Mary Watson testified in her deposition that during the second half of 2001 there was a substantial amount of correspondence between the Watson Agency and the GSA, which should be in the GSA files. The Weicks' administrative manager stated in her affidavit that she did not find any such correspondence in the GSA files of the Watson Agency. The Weicks contend that they were damaged by the failure to turn over that correspondence because "the failure of the Watsons to submit the necessary documentation to the GSA to qualify to bid on then existing contracts had a material adverse affect on the business of [the Watson Agency]." The Agreement did not require the Watsons to submit any documentation to the GSA. Their failure to do so prior to closing is in no way connected to their later alleged failure to deliver the GSA correspondence to the Weicks at closing. The district court did not err in dismissing this claim.

### D. Did the District Court Abuse its Discretion in its Award of Attorney Fees, and Is Either Party Entitled to an Award of Attorney Fees on Appeal?

The district court awarded the Watsons $57,735.65 in attorney fees pursuant to Idaho Code § 12–120(3). The Weicks challenge the amount of that award on appeal, contending that it is unreasonable. Both parties also request attorney fees on appeal. Because we vacate the final judgment, we also vacate the award of attorney fees below and do not award attorney fees on appeal. If, once a final judgment is entered, the district court awards attorney fees to either party, it may also award that party attorney fees for this appeal.

### IV. CONCLUSION

We reverse the granting of summary judgment dismissing the Weicks' counterclaims for fraud and for breach of contract based upon the failure to pay payroll taxes prior to the closing. We affirm the granting of summary judgment dismissing the Weicks' remaining claims. We vacate the judgment and remand this case for further proceedings consistent with this opinion.

Chief Justice SCHROEDER and Justices TROUT, BURDICK and JONES concur.

