180 P.3d 1048

In re SRBA, Case No. 39576
Subcase No: 29–11609.

CITY OF POCATELLO, Appellant,

v.

The STATE of Idaho, United States
of America and the Shoshone–
Bannock Tribes, Respondents.

No. 33669.

Supreme Court of Idaho,
Boise, January 2008 Term.

Feb. 19, 2008.

Rehearing Denied April 3, 2008.

A. Dean Tranmer, City of Pocatello, Pocatello, and White & Jankowski, Denver, Colorado, for appellant. Sarah A. Klahn argued.

The Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent State of Idaho. David J. Barber argued.

David Negri, U.S. Department of Justice, Boise, and Todd S. Aagaard, United States Department of Justice, Washington, D.C., for respondent United States of America. William Lazarus argued.

Wolfley Law Office, Pocatello, for respondents Shoshone–Bannock Tribes. Jeanette Wolfley argued.

J. JONES, Justice.

The City of Pocatello filed a claim in the Snake River Basin Adjudication (SRBA), asserting it had been granted a federal water right under an 1888 Congressional act. A special master in the SRBA determined that no such right existed. The district court affirmed on appeal, as does this Court.

## I.

President Andrew Johnson designated the Fort Hall Indian Reservation for the use of certain bands of the Shoshone and Bannock Tribes ("Tribes") by virtue of an 1867 executive order. The boundaries and terms of the Reservation were established the next year in the Second Treaty of Fort Bridger. The Treaty contained provisions for providing services on the Reservation, education for the Tribes, and allotments of land for farming by tribal members. The Treaty specifically required the written consent of a majority of adult male Indians for the cession of any portion of the Reservation.

In 1878, the Utah Northern Railway Company (the "Railroad") built a north-south line across the Reservation without permission from either the Tribes or the United States government. A few years later, the same company negotiated with the Tribes to build an east-west railroad line. The Tribes grant-

ed a right-of-way, which Congress approved. The lines intersected in the middle of the Reservation at a site called Pocatello Junction.

A settlement of non-Indian residents sprang up at the intersection. The settlers were trespassers, being on the Reservation without permission. In 1885, officials from the United States Department of the Interior ordered the removal of the trespassers, to no avail. The settlement continued, and federal authorities eventually came to realize they would not be able to remove the settlers without violence and bloodshed. A group of citizens from the town sent a petition begging not to be removed from the site, as many of them were railroad employees who would lose their jobs if forced to move. As the situation grew ever more tense, the Railroad asked the Secretary of the Interior to assist in negotiations with the Tribes.

In 1887, the Secretary of the Interior assigned Inspector Robert S. Gardner and Indian Agent Peter Gallagher, the agent in charge of the Reservation, to negotiate with the Tribes. Together, they negotiated a Cession Agreement in an intense one-day session. The Agreement was not without dissent. The Tribes were reluctant to cede any reservation land to non-Indians. However, Agent Gallagher persuaded the Indians that the cession would give them enough money to build irrigation ditches and shore up their farming industry, so a majority of male members of the Tribes voted to approve the Agreement. The Agreement transferred the Pocatello Townsite to the citizens of Pocatello and a right-of-way to the Railroad for its existing tracks. The Agreement made no mention of water or water rights.

After the Cession Agreement was approved by the Tribes, but before it was enacted into law, the question arose as to how the new city would obtain a water supply. In late 1887, the Commissioner of Indian Affairs, J.D.C. Atkins, began discussions with Agent Gallagher in this regard. Commissioner Atkins wrote to say, "The source of the water supply thus being, according to your statement, outside the limits of the proposed town-site . . . [and] on the reservation lands, I have construed your suggestion to mean that some guarantee in regard to water privileges, should be provided so far as the Indians and the reservation are concerned . . ." He proposed language to address this issue for inclusion in the legislation approving the Cession Agreement.

In a message to Congress, dated February 3, 1888, Commissioner Atkins called attention to the need to secure a water supply for the newly-formed City of Pocatello. In pertinent part, the message states:

> Inasmuch as conflicting opinions seem to prevail as to the source or sources from which the town will derive its supply of water, I have deemed it advisable, as a matter of precaution, to insert in the bill a clause providing for the use by the citizens of the town, in common with the Indians, of the waters of any river, creek, stream, or spring flowing through the reservations lands in the vicinity of the town, with the right of access at all times thereto, and the right to construct, operate, and maintain all such ditches, canals, works or other aqueducts, drain and sewerage pipes, and other appliances on the reservation, as may be necessary to provide with proper water and sewerage facilities.

Atkins provided Congress with the proposed legislation to approve the Cession Agreement. The legislation included the following provision:

> That the citizens of the town hereinbefore provided for shall have the free and undisturbed use in common with the said Indians of the waters of any river, creek, stream, or spring flowing through the Fort Hall Reservation in the vicinity of said town, with right of access at all times thereto, and the right to construct, operate, and maintain all such ditches, canals, works, or other aqueducts, drain, and sewerage pipes, and other appliances on the reservation, as may be necessary to provide said town with proper water and sewerage facilities.

This language became Section 10 of the bill approving the Cession Agreement. Act of September 1, 1888, ch. 936, 25 Stat. 452 (the "1888 Act").

One hundred and two years after passage of the 1888 Act, the City asserted Section 10 of the Act as the basis for its present claim. In 1990, the City filed a claim in the SRBA for a federal reserved water right, as an alternative to 38 separate prior claims based on state law.

The United States, the State of Idaho, and the Shoshone–Bannock Tribes (the "Opposing Parties") filed objections to the City's federal claim. All took the position that the 1888 Act did not create a federal reserved water right. All parties moved for summary judgment before a Special Master of the Snake River Basin Adjudication. In its motion, the City departed from its notice of claim and stated Section 10 gave the City "an express grant of a water right" via the Property Clause of the U.S. Constitution, rather than a reserved water right. The Special Master granted summary judgment to the Opposing Parties. The Master recommended the City's claim not be confirmed in a partial or final decree and denied the City's motion to alter or amend the recommendation.

The City challenged the Special Master's decision in district court. The district court affirmed the Special Master. The SRBA court determined Section 10 granted, at most, a right of access for appropriating water, not a water right. The court disallowed the City's claim for a water right and certified its order for appeal. The City appealed to this Court.

## II.

The question presented is whether Section 10 of the 1888 Act granted a federal water right to the City of Pocatello. We hold the Act created no such right. Rather, it granted the City access to surface water sources on the Reservation, along with the opportunity to establish a water right under state law.

## A.

■■■ This Court employs the same standard of review as the district court when ruling on a motion for summary judgment. *Watson v. Weick,* 141 Idaho 500, 504, 112 P.3d 788, 792 (2005). Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Idaho R. Civ. P. 56(c). If there is no genuine issue of material fact, "only a question of law remains, over which this Court exercises free review." *Watson,* 141 Idaho at 504, 112 P.3d at 792. Interpretation of a statute is a question of law over which this Court exercises free review. *Gooding Cty. v. Wybenga,* 137 Idaho 201, 204, 46 P.3d 18, 21 (2002). Where a federal statute grants privileges it must be strictly construed favorably to the government and "nothing passes but what is conveyed in clear and explicit language—inferences being resolved not against but for the government." *Caldwell v. United States,* 250 U.S. 14, 20, 39 S.Ct. 397, 398, 63 L.Ed. 816, 818 (1919).

## B.

The City cited Section 10 of the 1888 Act as the basis for its SRBA claim to a federal reserved water right. The claim states, "[t]he federal reserved water right claimed herein is in the alternative to, and not in addition to, water rights claimed by the city under state law." In the proceedings below, the City subsequently abandoned its reserved water right claim and amended its legal theory. It became the City's position that Section 10 of the 1888 Act expressly granted it a water right under the Property Clause of the U.S. Constitution. U.S. Const., art. IV, § 3, cl. 2. Thus, we need not address the reserved right claim.

### i.

The City argues that the district court imposed a "magic words" test to deny it a federal water right. However, that is not the case. The district court merely considered the plain language of Section 10 and found it did not convey a federal water right. Because this issue turns on statutory interpretation, we exercise free review. *Gooding Cty.,* 137 Idaho at 204, 46 P.3d at 21.

■■■ When interpreting a statute, the Court begins with the plain language. "[I]f

the statutory language is clear and unambiguous, the Court need merely apply the statute without engaging in any statutory construction. . . . Statutory interpretation begins with the words of the statute, giving the language its plain, obvious and rational meanings." *State v. Hagerman Water Right Owners*, 130 Idaho 727, 732, 947 P.2d 400, 405 (1997). Further, the Court "[w]ill resort to judicial construction only if the provision is ambiguous, incomplete, absurd, or arguably in conflict with other laws. There is no need to go beyond the language of the statute, when that language is clear and unambiguous." *Potlatch Corp. v. United States*, 134 Idaho 912, 914, 12 P.3d 1256, 1258 (2000) (citation and internal quotations omitted).

Section 10 reads:

That the citizens of the town hereinbefore provided for shall have the free and undisturbed use in common with the said Indians of the waters of any river, creek, stream, or spring flowing through the Fort Hall Reservation in the vicinity of said town, with right of access at all times thereto, and the right to construct, operate, and maintain all such ditches, canals, works, or other aqueducts, drain, and sewerage pipes, and other appliances on the reservation, as may be necessary to provide said town with proper water and sewerage facilities.

The City contends the language of Section 10 is clear and plainly conveys it a water right.

■ No one disputes Congress' power to make a grant of water rights. The federal government derives its power to dispose of the lands and waters of the United States under the Property Clause, U.S. Const., art. IV, § 3, cl. 2. "The relation of the federal government to the state government in the reclamation of desert lands arises out of the fact that the federal government owns the lands, and Congress is invested by the Constitution with the power of disposing of the same . . ." *Twin Falls Salmon River Land & Water Co. v. Caldwell*, 272 F. 356, 357 (9th Cir.1921), *cert. granted* 44 S.Ct. 135, *affirmed* 266 U.S. 85, 45 S.Ct. 22, 69 L.Ed. 178 (1924). However, the Court went on to say, "the states hav[e] jurisdiction to provide for the appropriation and beneficial use of the wa-

ters of the state . . ." *Id.* Merely because Congress *could* have granted the City a federal water right does not mean it did so in this case.

■ The language of Section 10 provides a right of access to water sources on the Reservation and the right to construct, operate, and maintain water facilities to allow the City to be served by those sources. However, as the district court concluded, Section 10 did not "contain historically recognized and accepted terms of conveyance such as 'grant' 'bargain' 'sell' or 'convey' evidencing a transfer in a property interest." The statute does not purport to grant a property interest, nor does it make reference to a "water right." Section 10 contains no language defining the nature and scope of any water right supposedly granted. The district court contrasted the language of Section 10 with Section 11 of the same Act, which provides, "[t]hat there be, and is *hereby granted,* to the said Utah and Northern Railway Company a right of way." (emphasis added). The court correctly concluded that Congress would have used more exacting language if it had intended to grant a water right to the City. This is especially true, given the rule of strict construction that federal courts apply to statutes in which the government grants privileges or relinquishes rights. As noted above, such statutes are construed to pass nothing "but what is conveyed in clear and explicit language." *Caldwell v. United States*, 250 U.S. at 20, 39 S.Ct. at 398, 63 L.Ed. at 818 .

In support of its claim, the City cites *Byers v. Wa–Wa–Ne*, 86 Or. 617, 169 P. 121 (1917). In that case the Oregon Supreme Court determined that a license to a non-Indian on a reservation had been converted by Congress into a water right. There, the Indian agent in charge of the Umatilla Indian Reservation granted a permit to a non-Indian to build a ditch through part of the reservation. *Id.* at 620–621, 169 P. at 122. The permission stated, "In granting this permission to construct the said water ditch, it is upon the express condition that *no permanent rights shall attach or become vested* . . ." *Id.* (emphasis added). Fifteen years later, in 1885, Congress passed an allotment act that stated in part, "That the water-right across a portion

of said reservation ... for manufacturing, irrigating, and other purposes, *be confirmed and continued* ..." *Id.* at 628, 169 P. at 124–25 (emphasis added). The Oregon Supreme Court examined this language and determined that the non-Indian received a water right because of the "confirmed" language of the allotment act. It examined a number of authorities on the legal force and effect of using the word "confirmed," and found it operated as a conveyance of a right. *Id.* at 629–30, 169 P. at 125. Thus, the Oregon Supreme Court found it could "unmistakably grasp the legislative intent which is controlling in the interpretation of this statute.... This right was infirm and Congress confirmed it." *Id.* at 630–631, 169 P. at 125. The same is not true in the case at bar. The language of Section 10 is far less explicit than that of the allotment act in *Byers.* As the district court pointed out, Section 10 contains none of the traditional terms of conveyance that would indicate that Congress actually granted a right. Indeed, Section 11 of the 1888 Act "grants" the Railroad a right of way, language Congress could easily have used in Section 10 but did not. Nor does the 1888 Act use the language "water-right," as does the 1885 allotment act. No Congressional action subsequent to 1888 "confirmed" any water right for the City. Thus, *Byers* provides no support for the City.

 A plain reading of the statutory language shows that the City was not granted a federal water right. Even if the language were determined to be ambiguous, the City's claim would fail. In construing a statute, this Court examines the language used, the reasonableness of the proposed interpretations, and the policy behind the statute. *Hagerman Water Right Owners,* 130 Idaho at 733, 947 P.2d at 406. Moreover, "the application of a statute is an aid to construction, especially where the public relies on that application over a long period of time." *Id.* As this Court has stated:

> It is ... improper to construe [statutes] in the abstract, without taking into consideration the historical framework in which they exist.... Correlatively, such information is also relevant when deciding what the statute means to others because it is important to know how people affected by an act understand it.

*Id.* at 733-4, 947 P.2d at 406–7 (quoting Sutherland Stat. Const. § 49.01 (5th ed.1992)). We first consider the historic context of the 1888 Act.

 Section 10 must be viewed in the context of the development of the arid western states. The settling of the western United States was a long and arduous process. A small number of people were charged with conquering vast territory. Irrigating the arid lands of the west required one precious resource more than any other: water. "From a line east of the Rocky Mountains almost to the Pacific Ocean, and from the Canadian border to the boundary of Mexico, an area greater than that of the original thirteen in the main, constituted a desert, impossible of agricultural use without artificial irrigation." *California Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142, 156, 55 S.Ct. 725, 728, 79 L.Ed. 1356, 1361 (1935). Initially, the task of settling the land fell to a few pioneers with little help from territorial or federal government. *Id.* These settlers depended on a system of appropriation to determine water rights, rather than deferring to the common law doctrine of riparian rights. *Id.* at 157, 55 S.Ct. at 728, 79 L.Ed. at 1361. Eventually, the state, territorial, and federal governments recognized that the only way the arid lands of the west could be settled and turned to agricultural use was to officially recognize the law of appropriation as the law of the land. *Id.* at 157–58, 55 S.Ct. at 728–29, 79 L.Ed. at 1361. To that end, Congress passed laws regarding homesteading, mining, and other matters. The import of these laws was clear: the federal government deferred to the states on the matter of controlling western waters. "The public interest in such state control in the arid land states is definite and substantial." *Id.* at 165, 55 S.Ct. at 732, 79 L.Ed. at 1365. In California Oregon Power Co., the Supreme Court merely affirmed a doctrine the western state courts had long recognized—the law of appropriation. *See, e.g., Eddy v. Simpson,* 3 Cal. 249, 252 (1853) (California Supreme Court establishes that water rights are based on first possession);

*Lobdell v. Simpson,* 2 Nev. 274 (1866) (Nevada Supreme Court recognizes and applies prior appropriation doctrine); *Coffin v. The Left Hand Ditch Co.,* 6 Colo. 443 (1882) (Colorado Supreme Court rejects riparian rights and adopts appropriation); *Malad Valley Irrigating Co. v. Campbell,* 2 Idaho 378, 18 P. 52 (1888) (Supreme Court of the Territory of Idaho recognizes that first appropriation for beneficial use gives superior right).

Congress responded to the need for clarification of water rights with several laws in the 1860s and 1870s. The most important of these for our purposes is the Desert Land Act of March 3, 1877, ch. 107, 19 Stat. 377. The crucial portion of the Act stated that all water not claimed by appropriation "shall remain and be held free for the appropriation and use of the public." *Id.* In construing the Desert Land Act, the Supreme Court stated, "Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest." *California Oregon Power Co.,* 295 U.S. at 163, 55 S.Ct. at 731, 79 L.Ed. at 1364. Instead, the Court held,

> [F]ollowing the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, *subject to the plenary control of the designated states,* including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain.

*Id.* at 163–64, 55 S.Ct. at 731, 79 L.Ed. at 1364 (emphasis added).

Deference to state water law has since continued uninterrupted. For example, Congress passed the Reclamation Act of June 17, 1902, ch. 1093, 32 Stat. 388, in order to create massive projects intended to fully reclaim the arid lands. Projects built under the Act were required to comply with state water law. In a fairly recent dispute involving the Reclamation Act, the U.S. Supreme Court conducted an extensive review of federal deference to state water law. The Court stated,

"The history of the relationship between the Federal Government and the States in the reclamation of the arid lands of the Western States is both long and involved, but through it runs the consistent thread of purposeful and continued deference to state water law by Congress." *California v. United States,* 438 U.S. 645, 653, 98 S.Ct. 2985, 2990, 57 L.Ed.2d 1018, 1025 (1978). Ultimately, the Court recognized only two restrictions on the States' exclusive control of water: reserved rights on federal government property and navigation servitude (neither of which is involved here). *Id.* at 662, 98 S.Ct. at 2994, 57 L.Ed.2d at 1030 (citing *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 703, 19 S.Ct. 770, 775, 43 L.Ed. 1136, 1141 (1899)).

Based on the long-standing and firmly established policy of deference and absent express Congressional action to the contrary, state water law controls. While Congress can certainly grant water rights under the Property Clause, it would require explicit language in order to overcome the right of the state to manage and allocate its own water resources. There being no such explicit language in Section 10, state water law controls any claims by the City. If this Court were to determine Section 10 granted a federal water right, that right would conflict with a century's-worth of federal deference to state law.

Neither does the background for inclusion of Section 10 in the 1888 Act support the City's position. When the Cession Agreement was being negotiated with the Tribes, no mention was made of water rights, either for the Tribes or the City, or of non-Indians accessing or conveying water over those lands retained in the Reservation. After the Cession Agreement was signed on May 27, 1887, Agent Gallagher suggested to Commissioner Atkins that legislation approving the Cession Agreement should contain a provision regarding water supply and sewage for the proposed town of Pocatello. In a letter directed by Atkins to Gallagher on December 29, 1887, Atkins noted that the contemplated source of the city's water supply was on Reservation lands, outside the limits of the proposed townsite. Atkins proposed lan-

guage along the lines subsequently included as Section 10 in the bill in order to provide "some guarantee to water privileges ... so far as the Indians and the Reservation are concerned." In his message to Congress, accompanying the draft of legislation to approve the Cession Agreement, Atkins noted that he deemed it advisable to insert the Section 10 language "[i]nasmuch as conflicting opinions seem to prevail as to the source or sources from which the town will derive its water supply."

Prior to enactment of the 1888 Act, Gallagher again wrote to the Commissioner, asking "to be informed what rights are guaranteed to these tribes, under treaty & executive orders," to the Blackfoot and Snake Rivers, pointing out that white settlers along the opposite side of the Blackfoot River appeared to be constructing ditches and dams that had left the Indians without water to irrigate their crops. An acting Commissioner responded on August 20, 1888:

> I do not find that the treaty makes any provision relating to the use of water in the streams.
>
> Water rights and privileges are regulated by the laws of Idaho, and doubtless the Indians are entitled to the same rights as white settlers would be under similar circumstances.

The acting Commissioner continued:

> I have to state that white men have no right to construct bridges, dams, flumes, or reservoirs on the reservation, nor have they the right to construct abutments, piers, or other works upon the reservation banks of the boundary streams. Such authority can only be given by Congress.

Several weeks later Congress passed the 1888 Act.

The discussions leading up to enactment of Section 10 did not relate to water rights and who should have them but, rather, water sources and how to ensure that the City had access to them. That is, the discussion focused on the fact that most surface water resources were located on Reservation lands and that the City would need to have access to those sources and the ability to convey water from them in order to have a water supply. Because of the trespass problems leading up to the negotiation of the Cession Agreement, it was rather clear that there needed to be a right of way approved by Congress. The participants in the discussion clearly indicated that the issue of water rights—how they were to be obtained and granted—was a matter of state law. Congress, however, had to provide the necessary access for enjoyment of any state water rights.

Events subsequent to the passage of the legislation confirm this state of affairs. After the 1888 Act was passed, the Idaho Canal Company began to build a canal from the Snake River to the City. The president of the company wrote to Commissioner Atkins, explaining that the citizens of Pocatello wanted to contract with his company to construct the canal and bring water to the City. He inquired of the Commissioner whether his crews could go onto the Reservation in order to access the water provided in Section 10. The Commissioner sought the advice of Assistant Attorney General George Shields.

In an 1891 letter interpreting Section 10, Assistant Attorney General George Shields opined that Section 10 was a mere license:

> In view of the fact that the provision of said section of the statute is in derogation of the rights of the Indians as secured by treaty, I am of the opinion that the grant should be strictly construed....
>
> In other words, the statute authorizes those, at the time citizens of said town, to go upon the lands of the Indian for the purpose of bringing water to the town, and for that purpose to construct, operate, and maintain a canal. This right is in the nature of a *mere license*—authority to do an act, which without such authority would be illegal.

(emphasis added). Thus, Shields determined the rights granted in Section 10 had to be strictly construed and extended only to "citizens" of Pocatello—not to a canal company. Further, Shields determined Section 10 allowed only access, not water.

In response to Shields' opinion, Congress added a provision to the Indian Department Appropriation Act of March 3, 1891, ch. 543, 26 Stat. 989 ("1891 Act"). The provision in

the 1891 Act allowed the Secretary of the Interior to grant rights of way into the Reservation for canal, ditch, and reservoir companies. It reads:

That the Secretary of the Interior is authorized to grant rights of way into and across the Fort Hall Reservation in Idaho to canal, ditch, and reservoir companies for the purpose of enabling the citizens to thereby receive the water supply, contemplated by section ten (10) of an act to accept and ratify an agreement made with the Shoshone and Bannock Indians, and for other purposes ... and may also attach conditions as to the supply of surplus water to Indians on said Fort Hall Reservation....

Notably, the 1891 Act does not expand any of the rights in Section 10, nor does it refer to any of those rights as a water right. Instead, the 1891 Act uses the term "water supply." The Act simply granted the Secretary of the Interior authority to grant canal companies use of the access previously provided for in Section 10.

Nor does any subsequent historical authority give support to the City. The Tribes ceded more land for the City several years after the 1888 Act, and the border of the reservation moved more than 10 miles from the city limits. Throughout the period from 1888 to 1990, the City sought adjudication of any water rights under state law. Finally, the 1990 Fort Hall Water Rights Settlement Agreement settled water disputes between the Tribes, the State of Idaho, and the United States, but did not recognize any rights held by the City. Thus, neither the history or purpose of the 1888 Act supports the City's claim to a federal water right.

ii.

The City contends that the district court erred by failing to interpret the "in common with" language in Section 10 as granting the City a portion of the Tribes' water right. The City points to a number of cases, which it contends to be supportive of such interpretation. However, the cases upon which the City relies deal with interpretation of Indian treaties and employ Indian canons of construction. The district court correctly declined to apply Indian canons of construction to the City's claim. Such canons are for the benefit of Indian tribes, not non-Indians.

■■■ Treaty interpretation is similar to contract interpretation. *Bonanno v. United States*, 12 Cl.Ct. 769, 771 (1987). However, unlike contract interpretation, the interpretation of a treaty, including an Indian treaty, is a question of law for a court to decide. *Cayuga Indian Nation of New York v. Cuomo*, 758 F.Supp. 107, 111 (N.D.N.Y. 1991) (citing *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n. 2 (9th Cir. 1986)). The examination of a treaty's negotiating history and purpose does not render its interpretation a matter of fact but merely serves as an aid to the legal determination which is at the heart of all treaty interpretation. *Bonanno*, 12 Cl.Ct. at 772. While we are dealing with a statute, the City contends that the treaty canons of construction apply equally here. While we do not decide that to be the case, even if it were, the canons would not favor the City.

The City argues that "in common with" language in a treaty grants a right, not merely a right of access. In *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n (Fishing Vessel)*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), the Supreme Court determined that treaty language securing a "right of taking fish ... in common with all citizens of the Territory" granted the Indians a share of each run of fish passing through historical tribal fishing areas. *Id.* at 679, 99 S.Ct. at 3071, 61 L.Ed.2d at 841. In that case, the State of Washington and the commercial fishing associations had argued the "in common with" language merely granted the Indians a right of access. *Id.* at 675, 99 S.Ct. at 3069, 61 L.Ed.2d at 839. The Court disagreed. However, the case offers no support to the City. The Court reached its conclusion after an extensive discussion of Indian tribal rights. The Court acknowledged, "It is true that the words 'in common with' may be read either as nothing more than a guarantee that individual Indians would have the same right as individual non-Indians or as securing an interest in the fish runs themselves." *Id.* at 677, 99 S.Ct. at 3070, 61 L.Ed.2d at 840.

However, the Court held that it was crucial to interpret the right in the sense the Indians themselves would have interpreted it. It stated, "[t]he treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians." *Id.* at 676, 99 S.Ct. at 3069, 61 L.Ed.2d at 839 (citing *Jones v. Meehan*, 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49, 54 (1899)). The Court stressed it was crucial to consider both parties' intentions in signing the treaty. "[I]t is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties." *Fishing Vessel,* 448 U.S. at 675, 99 S.Ct. at 3069, 61 L.Ed.2d at 839. Thus, the critical determination in that case was what the Indians felt they were giving up when signing the treaty. As such, the Court found the "in common with" language in the treaty was intended to guarantee a share of the fish harvest to the Indians, not merely a right of access.

 The Court's reasoning does not support the City. In *Fishing Vessel,* the Court interpreted the "in common with" language to *benefit* the Indians, especially in that the treaty in that case was a grant of rights *from* them. In this case, the district court correctly declined to apply the Indian canons of construction to the City's claim. The language that supported the fishing rights in *Fishing Vessel* was part of a treaty. A treaty is viewed as "a contract between two sovereign nations." *Fishing Vessel,* 443 U.S. at 675, 99 S.Ct. at 3069, 61 L.Ed.2d at 839. A treaty with an Indian Tribe constitutes a grant of rights *from* them, not a grant of rights from the United States *to* the Indians. *Id.* at 680, 99 S.Ct. at 3072, 61 L.Ed.2d at 842. Thus, the language must be interpreted as the Indians themselves interpreted it. In contrast, the language at issue in Section 10 is not embedded in a treaty—it is part of a statute. The language in Section 10 did not originate as part of a treaty—indeed, it was added several months after the negotiations for the Cession Agreement had concluded. The Tribes had no say in the development of Section 10. As discussed below, Congress will not abrogate Indian rights without clear intent and an express

agreement from the Indians. Further, "[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation,* 502 U.S. 251, 269, 112 S.Ct. 683, 693, 116 L.Ed.2d 687, 704 (1992) (quoting *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753, 759 (1985)). Thus, if Section 10 was ambiguous, this Court would construe it in favor of the Tribes, not the City. In sum, the City cannot claim the benefit of the Indian canons of construction, and the district court properly declined to apply them.

An additional consideration must be taken into account with regard to the City's claim, which it asserts entitles it to a share of the Tribes' reserved water right. American law treats Indian tribes differently than it does other sovereign nations or private individuals. First and foremost is the notion that agreements with Indians are to be interpreted to the benefit of the tribes. For example, the Supreme Court has stated,

> [W]e will construe a treaty with the Indians as "that unlettered people" understood it, and "as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection," and counterpoise the inequality "by the superior justice which looks only to the substance of the right, without regard to technical rules."

*United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 664, 49 L.Ed. 1089, 1092 (1905) (citing *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 90, 30 L.Ed. 306, 315 (1886); *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899)). Congress certainly has the power to abrogate Indian treaty rights, but its intent to do so must be clear. *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians,* 526 U.S. 172, 202, 119 S.Ct. 1187, 1203, 143 L.Ed.2d 270, 295 (1999); *United States v. Dion,* 476 U.S. 734, 739–40, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767, 773–75 (1986) (abrogation of treaty rights requires "clear evidence that Congress actually considered the conflict between its

intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.").

The Tribes' water rights in this case are not spelled out in the Second Treaty of Fort Bridger, but the Treaty's failure to explicitly include the water right is immaterial to this question. In *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), the Supreme Court recognized for the first time that, when the federal government withdraws land from the public domain for a federal purpose, it impliedly reserves enough water to fulfill that purpose. Thus, the Tribes in this case impliedly received the water rights necessary to sustain the purposes of their reservation with the treaty establishing the Reservation. The question is whether the Cession Agreement, ratified by the 1888 Act, abrogated any of the Tribes' rights. The answer to this question must be no.

First, in order to abrogate any treaty rights, Congressional intent must be clear. As demonstrated above, the plain language of Section 10 does not indicate an intent to grant the City a water right. Congress knew how to grant a water right in abrogation of Indian treaty rights, as demonstrated in the *Byers* case. *Byers* is particularly important in demonstrating what Congress would do in granting a water right to a non-Indian in abrogation of treaty rights because the act in question, the Pendleton Townsite Act, was enacted in 1885, three years prior to the 1888 Act. Congress knew how to do what the City wants here, but failed to do so in the 1888 Act.

Second, in order to abrogate any treaty rights held by Tribes, a majority of adult male Indians on the Reservation must consent. Thus, the vote of a majority of adult male members of the Tribes was required in order to cede any water rights. Such consent was not given. Section 10 was added several months after the Cession Agreement was negotiated. Considering that the Indians were loathe even to give up any land, it seems unlikely they would have given up any water rights had the issue been raised. The record does not reveal a single instance where the Indians were apprised of the possibility that they were to lose some water rights. Serious discussions between the federal officials and the Indians would certainly have ensued if that were the case. However, it was not. In *Byers,* the court noted that it "affirmatively appears from the record in this case that a majority of the male adult Indians on the reservation assented in writing to the act ..." 86 Or. at 632, 169 P. at 126. Thus, without clear Congressional intent to abrogate some of the Tribes' reserved water rights and an agreement by a majority of adult Indian males to cede some water rights, the City's argument fails.

### C.

Finally, the City argues that the district court erred in that it limited Congressional authority to grant a water right under Section 10. Congress's power to grant federal water rights arises under the Property Clause. The clause states, "[C]ongress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States ..." U.S. Const., art. IV, § 3, cl. 2. Merely because Congress has this power does not mean it exercised it in Section 10.

None of the parties denies Congress' power to have granted the City a water right. "The power of the government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be." *Winters,* 207 U.S. at 577, 28 S.Ct. at 212, 52 L.Ed. at 346–47 (citing *United States v. Rio* Grande Dam & *Irrigation Co.,* 174 U.S. 690, 703, 19 S.Ct. 770, 775, 43 L.Ed. 1136, 1141 (1899)). The question is whether Congress exercised that power in this case. As discussed above, Congress chose not to exercise its power here.

### D.

Because we conclude the City does not have a federal water right, we need not address other issues raised by the parties,

which depended upon a favorable outcome for the City on that issue.

## III.

We affirm the district court. Costs to the Respondents.

Chief Justice EISMANN, and Justices BURDICK, W. JONES, and HORTON concur.