## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 36844

| | |
|---|---|
| PATRICK STUARD and JEANNE STUARD, husband and wife, | ) ) ) | Boise, January 2011 Term |
| Plaintiffs-Appellants, | ) ) | 2011 Opinion No. 47 |
| v. | ) ) | Filed: April 1, 2011 |
| SAMUEL JORGENSON, M.D., | ) ) | Stephen W. Kenyon, Clerk |
| Defendant-Respondent. | ) ) | |
| _____ | ) | |

Appeal from the district court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Timothy Hansen, District Judge.

The decision of the district court is <u>affirmed.</u> No attorney fees are awarded. Costs on appeal are awarded to respondent.

Comstock & Bush, Boise and Byron Foster, Boise, attorneys for Appellants. John A. Bush argued.

Carey Perkins, LLP, Boise, for Respondent. Jeremiah A. Quane argued.
_____

W. JONES, Justice

### I. NATURE OF THE CASE

Respondent Dr. Samuel Jorgenson, M.D., negligently performed a spinal surgery on Appellant Patrick Stuard on July 15, 2004. Stuard's symptoms subsided after the surgery and Dr. Jorgenson did not realize he had negligently operated at the wrong spinal level until over two years later. The parties dispute whether, for purposes of the two-year statute of limitations, the cause of action accrued at the time of the surgery or instead at the time the mistake came to light because of a second injury, when the error was discovered. Stuard appeals from the district court's grant of summary judgment to Dr. Jorgenson. The district court held that the cause of action accrued at the time of the negligent surgery, and was therefore barred.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On July 15, 2004, Dr. Samuel Jorgenson performed a spinal surgery on Patrick Stuard. Stuard had suffered an on-the-job injury on or about March 1, 2004. In performing the surgery,

1

Stuard was placed under anesthesia, his back was cut open to expose his spine, tissue and disk material of the spine was removed, holes were drilled into Stuard's spine and a plate was installed to permanently stabilize and support the spine. Dr. Jorgenson was supposed to operate on the T6-7 spinal level but instead performed the operation on the T5-6 level.[1] Dr. Jorgenson did not realize at that time that he had operated on the wrong level. Stuard had several follow up visits with Dr. Jorgenson as well as x-rays after the surgery, in which Dr. Jorgenson did not determine that he had operated at the wrong level. The chest x-rays were ordered for the routine purpose of determining whether any material had shifted or come loose, to see if any spinal fractures had developed, and to see if any screws had torn out.[2] While the record indicates that an MRI would have, and eventually did, reveal the surgery was performed at the wrong level, Dr. Jorgenson did not order one until September 20, 2006, after the second injury occurred.

During the first post-operative office visit on August 4, 2004, Dr. Jorgenson took x-rays and noted that Stuard's "original pain [was] relieved with surgery." At the second visit on August 18, 2004, the office assistant conducting the visit noted that the post operative course was proceeding as expected. At the next visit on September 1, 2004, Dr. Jorgenson wrote that Stuard had told him that "his preoperative symptoms [were] completely relieved," and on September 29, 2004, Dr. Jorgenson reported that Stuard "continues to be completely asymptomatic from his left side." On November 1, 2004, and February 25, 2005, Dr. Jorgenson took more x-rays of Stuard and again found that Stuard's pain was resolved.

Stuard suffered a second work-related injury on August 31, 2006 and began to experience pain. Dr. Jorgenson performed an MRI on Stuard's spine on September 20, 2006. Sometime after that MRI, the workers compensation nurse case manager finally brought to Dr. Jorgenson's attention that he had operated on the wrong level. Dr. Jorgenson stated in his deposition that he did not have knowledge that he had operated at the wrong level until after Stuard's September 28 and October 9 visits in 2006. On October 27, 2006, Dr. Jorgenson ordered another MRI and finally determined conclusively that he had operated at the wrong level. Dr. Jorgenson testified

---

[1] The "level" refers to both the area of the spine and the specific part of the spine in that area. The spine is split into four areas: cervical, thoracic, lumbar and sacral, starting at the top of the spine. The number is assigned by counting down the vertebrae of the spine in that area. Stuard's injury occurred in the thoracic area.

[2] According to Dr. Jorgenson's deposition testimony, the chest x-rays show only a portion of the spine and therefore Dr. Jorgenson did not "have the ability to count levels and to accurately assess the actual levels where the hardware was placed."

in his deposition that he informed Stuard of this fact on November 20, 2006, stating in his deposition:

> I told him that we had intended to operate on the T6-7 level. And it appears from the x-rays that we had inadvertently operated on the T5-6 level. As a consequence, he still had the same pathology and same herniation at the T6-7 level as he had before. And that's what I believe is causing his current symptoms.

Stuard then consulted Dr. Tyler Frizzell, M.D., who performed surgery to remove the plate and some of the hardware from the T5-6 level and execute the correct procedure at the T6-7 level.

Stuard filed an application for the convening of a prelitigation screening panel with the Idaho State Board of Medicine on April 2, 2007. He filed his Complaint and Demand for a Jury Trial for medical malpractice against Dr. Jorgenson on February 14, 2008.[3] Dr. Jorgenson answered, raising the statute of limitations as a defense. Stuard filed an Amended Complaint on December 10, 2008 and Dr. Jorgenson answered. Dr. Jorgenson filed a motion for summary judgment on February 17, 2009, arguing that the action was barred by the statute of limitations contained in I.C. § 5-219(4), which was granted by the district court. The court held that the action accrued at the time of the surgery because the ongoing presence of the herniated disk, and the other injuries from the surgery itself, were objectively ascertainable at that time, and therefore the action was barred. It also held that the foreign-object exception did not apply to the hardware installed at the wrong level, and even if it did, the action was still untimely because the Complaint and Demand for Jury Trial were not filed until February 14, 2008. Judgment was entered on July 14, 2009, and Stuard timely filed a notice of appeal. Stuard filed a Motion for Reconsideration arguing that the action was timely if the foreign-object exception applied because the filing of a Prelitigation Claim with the Idaho State Board of Medicine tolls the statute of limitations under I.C. § 6-1005.[4] The district court issued an Amended Memorandum

---

[3] His wife, Jeanne Stuard, is also listed as a Plaintiff/Appellant, and has alleged loss of "services, society, care, comfort and companionship of her husband, Plaintiff Patrick Stuard." For purposes of clarity, Appellants will be referred to as "Stuard" in the singular rather than the plural.

[4] Idaho Code § 6-1005 provides:
> There shall be no judicial or other review or appeal of such matters. No party shall be obliged to comply with or otherwise [be] affected or prejudiced by the proposals, conclusions or suggestions of the panel or any member or segment thereof; however, in the interest of due consideration being given to such proceedings and in the interest of encouraging consideration of claims informally and without the necessity of litigation, the applicable statute of limitations shall be tolled and not be deemed to run during the time that such a claim is pending before such a panel and for thirty (30) days thereafter.

3

Decision and Order, limiting its holding regarding the foreign-object exception to the determination that it did not apply, and maintaining its other holdings.

### III. ISSUES ON APPEAL

**1.** Whether there was a genuine issue of material fact as to whether "some damage" was "objectively ascertainable" at the time the first surgery was negligently performed such that the action accrued at that time under I.C. § 5-219.

**2.** Whether the locking plate and other hardware installed at the wrong spinal level constitute a "foreign object" under I.C. § 5-219, such that the discovery rule would apply.

### IV. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). "If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review." *Watson v. Weick*, 141 Idaho 500, 504, 112 P.3d 788, 792 (2005). When there is conflicting evidence as to when the cause of action accrued, the issue is one for the trier of fact. *Id.* The statute of limitations is an affirmative defense and the defendant has the burden of establishing the elements necessary to establish the defense. *Hawley v. Green*, 117 Idaho 498, 504, 788 P.2d 1321, 1327 (1990).

### V. ANALYSIS

"An action to recover damages for 'professional malpractice' must be commenced within two years after the cause of action has accrued." *Conway v. Sonntag*, 141 Idaho 144, 146, 106 P.3d 470, 472 (2005); I.C. § 5-219(4).[5] The cause of action accrues "as of the time of the

---

[5] I.C. § 5-219(4) provides:

> Within two (2) years . . . An action to recover damages for professional malpractice, or for an injury to the person, or for the death of one caused by the wrongful act or neglect of another, including any such action arising from breach of an implied warranty or implied covenant; provided, however, when the action is for damages arising out of the placement and inadvertent, accidental or unintentional leaving of any foreign object in the body of any person by reason of the professional malpractice of any hospital, physician or other person or institution practicing any of the healing arts or when the fact of damage has, for the purpose of escaping responsibility therefor, been fraudulently and knowingly concealed from the injured party by an alleged wrongdoer standing at the time of the wrongful act, neglect or breach in a professional or commercial relationship with the injured party, the same shall be deemed to accrue when the injured party knows or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of; but in all other actions, whether arising from professional malpractice or otherwise, the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of, and the limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom or any continuing professional or commercial relationship between the injured party and the alleged wrongdoer, and,

4

occurrence, act or omission complained of" unless it is based upon leaving a foreign object in a patient's body or fraudulent concealment of damage. I.C. § 5-219(4). Fraudulent concealment is not alleged here. If the "foreign object" exception applies, the cause of action only accrues once the plaintiff "knows or in the exercise of reasonable care should have been put on inquiry" of the injury. I.C. § 5-219(4). Otherwise, "[i]n most cases, the act or omission complained of and the injury to the plaintiff occur at the same time, particularly in the medical context." *Davis v. Moran*, 112 Idaho 703, 708, 735 P.2d 1014, 1019 (1987). However, this Court has held that there must be "some damage" before the action begins to accrue. *Lapham v. Stewart*, 137 Idaho 582, 586, 51 P.3d 396, 400 (2002).

## A. The Action Accrued at the Time the First Surgery Was Negligently Performed Because "Some Damage" Was "Objectively Ascertainable" at That Time.

Assuming first that the "foreign object" exception does not apply, this Court has recognized that a professional malpractice action only accrues once there has been "some damage." *Conway*, 141 Idaho at 146, 106 P.3d at 472; *Streib v. Veigel*, 109 Idaho 174, 178, 706 P.2d 63, 67 (1985). In *Davis v. Moran*, this Court stated that the damage must be "objectively ascertainable." 112 Idaho at 709, 735 P.2d at 1020. In that case, the Court explained that "objectively ascertainable" means "that objective medical proof would support the existence of an actual injury." *Id.* at 709 n.4, 735 P.2d at 1020 n.4.[6] Subsequent decisions by this Court have recognized that "[t]he existence of 'objectively ascertainable injury' is simply an analytical tool

---

provided further, that an action within the foregoing foreign object or fraudulent concealment exceptions must be commenced within one (1) year following the date of accrual as aforesaid or two (2) years following the occurrence, act or omission complained of, whichever is later. The term "professional malpractice" as used herein refers to wrongful acts or omissions in the performance of professional services by any person, firm, association, entity or corporation licensed to perform such services under the law of the state of Idaho. This subsection shall not affect the application of section 5-243, Idaho Code, except as to actions arising from professional malpractice. Neither shall this subsection be deemed or construed to amend, or repeal section 5-241, Idaho Code.

[6] In *Davis*, it was unclear when the actual injury from the negligent radiation treatment had occurred. Therefore, the Court required objective medical proof in order to determine when the "real injury" occurred. *Davis*, 112 Idaho at 709, 735 P.2d at 1020. *Davis* specifically recognized the "unique problem posed by . . . radiation exposure cases," which is that "the injury does not occur at the moment of radiation." *Id.* The facts here do not involve radiation, and it is not disputed that because the surgery was performed at the wrong level, otherwise healthy tissue was removed and hardware was installed at the wrong level. Similarly, in *Brennan v. Owens-Corning Fiberglas Corp.*, 134 Idaho 800, 802, 10 P.3d 749, 751 (2000), this Court held that the accrual of a cause of action for injuries related to asbestosis did not occur until an x-ray of the patient's chest showed scarring, giving "objective medical proof that would support the existence of an actual injury resulting from exposure to asbestos." *Id.* That case involved the unique circumstances of asbestos, where the existence of an "actual injury" is completely unknown to anyone until a symptom occurs. This case is distinguishable because the "existence of an actual injury," the removal of healthy tissue and installation of hardware at the wrong level, was capable of being ascertained at the time of the negligence.

5

to be used in determining when 'some damage' has occurred." *Conway*, 141 Idaho at 146–47, 106 P.3d at 472–73 (citing *Lapham*, 137 Idaho at 587, 51 P.3d at 401). "[T]he 'some damage' that has occurred must be damage that the client could recover from the professional in an action for malpractice." *City of McCall v. Buxton*, 146 Idaho 656, 659, 201 P.3d 629, 632 (2009). Further, the statute makes clear that any "continuing consequences" of the act or omission do not extend the limitations period. I.C. § 5-219(4).

Stuard argues he did not suffer any damage until Aug 31, 2006, the date of his second work-related injury, because he did not have any symptoms or knowledge of the negligence of Dr. Jorgenson until that time. The facts of this case are admittedly unique, in that neither party can explain why Stuard's symptoms subsided when his herniated disk injury was not correctly treated. However, this Court has made very clear that "[w]hether there was some damage, or whether that damage was objectively ascertainable, does not depend upon the knowledge of the injured party" because such dependence would effectively create a discovery rule, which the legislature has expressly rejected. *Lapham*, 137 Idaho at 587, 51 P.3d at 401. Therefore, subjective knowledge of Stuard's injury is not relevant to the determination of when "some damage" occurred under Idaho's clear legislative direction and the case law following it. *See Chicoine v. Bignall*, 122 Idaho 482, 487, 835 P.2d 1293, 1298 (1992). Stuard seems to equate "symptoms" with "damage." However, symptoms are by nature subjective, and therefore are not determinative in an "objective" analysis such as the one this Court has stated is the standard for evaluating the accrual of a professional malpractice claim.

In its decision, the district court noted the damages that occurred because of the negligent surgery, including the removal of healthy tissue and the installation of hardware at the wrong level. The fact that these injuries occurred was not disputed. There may have been additional consequences of Dr. Jorgenson's negligent surgery in the failure to recognize his mistake in his subsequent visits with Stuard, but the consequences from Stuard and Dr. Jorgenson's continuing relationship do not extend the limitations period. I.C. § 5-219(4) ("[T]he limitation period shall not be extended by reason of any continuing consequences or damages resulting therefrom or any continuing professional or commercial relationship between the injured party and the alleged wrongdoer."). The negligent act was the performance of the surgery at the wrong level. The injury was the removal of healthy tissue and installation of medical hardware at the wrong level. Idaho Code § 5-219 does not allow for a separate statute of

6

limitation for each injury that occurs from the negligence, it allows for one cause of action that accrues once the act and injury have occurred.

Stuard argues in his brief that the lack of medical records in the evidence depicting that the surgery was negligently performed at the wrong level indicate that there was not some damage that was objectively ascertainable. The language of *Davis* defining "objectively ascertainable" to mean "that objective medical proof would support the existence of an actual injury," means that the existence of the injury is capable of being objectively ascertained. *Davis*, 112 Idaho at 709 n.4, 735 P.2d at 1020 n.4. To allow for accrual to begin only once the parties have been put on notice of the damage, or in other words, once the damage is actually "ascertained" would effectively create a discovery rule, which the legislature has rejected. Dr. Jorgenson provided expert testimony in the form of a sworn affidavit that the injury was objectively ascertainable at the time of the surgery. He also stated in his deposition that because the surgery was performed at the wrong level, Stuard "had the same pathology and same herniation at the T6-7 level as he had before." Stuard has not provided any conflicting expert testimony to state that the injury was not objectively ascertainable at that time, or that the negligence and ensuing injury to Stuard because of that negligence did not exist or would not have been discovered had an MRI been taken immediately following the surgery. According to the evidence in the record, the injury was thus "objectively ascertainable" at the time of the surgery, because had objective medical proof in the form of an MRI been ordered, it would have shown the surgery was performed at the wrong level, and that Stuard had suffered damages as a result of its performance at the wrong level.

Stuard suffered objectively ascertainable damages from the surgery itself. As shown in the documentation of the surgery, Stuard's back was cut into, healthy tissue was negligently removed, and a locking plate, screws, and other hardware were negligently placed at the wrong spinal level. Had Stuard's claim survived the motion for summary judgment and gone to trial, he likely would have asked for compensation for these damages from the negligent surgery.[7] Thus, these damages satisfy the "some damage" standard. *Buxton*, 146 Idaho at 659, 201 P.3d at 63.

---

[7] In his Amended Complaint, Stuard asked for several damages from the court. The Damages section of his Amended Complaint states:

As a result of Defendant's acts of negligence, recklessness and gross negligence as defined herein, Plaintiffs are entitled to recover all damages allowed by law, including, but not limited to:

a. Loss of the past and future expenses for the provision of medical care, treatment, therapy, prescriptions and other health care services and products, in an amount to be proven at trial;

Therefore, the district court properly concluded that there was no genuine issue of fact that the cause of action accrued on July 15, 2004, the date of the negligently performed surgery. In its original decision, the district court failed to recognize that I.C. § 6-1005 tolls the statute of limitations "upon the filing of a request for a prelitigation screening panel, during the time the claim is pending before the panel, and for thirty days thereafter." *Conway*, 141 Idaho at 146, 106 P.3d at 472. Thus, in order not to be barred by the statute of limitations, the prelitigation screening request or the Complaint must have been filed by July 15, 2006. The prelitigation screening request was not filed until April 2, 2007, and the Complaint was not filed until February 14, 2008. Therefore, Stuard's claim for medical malpractice is barred. While this application is indeed harsh given that Stuard did not himself know the operation was negligently performed, his arguments are better to be taken up with the legislature in the adoption of a discovery rule for all medical malpractice claims. This Court has no power to create such a rule by judicial fiat. The statute and this Court's case law, as it stands, are clear that the statute of limitations accrues once some damage that is objectively ascertainable occurs.

The Dissent likens this case to this Court's application of the "some damage" rule in two legal malpractice cases, *Chicoine* and *Buxton*. However, the financial injuries suffered as a result of the alleged legal malpractice in those cases are distinguishable from the personal injury suffered as a result of the medical malpractice in this case. In *Chicoine*, the Court found that Chicoine could not have suffered any damages as a result of the lawyer's negligence in not timely filing a motion for new trial until this Court reversed the district court's grant of the motion for new trial, because the grant of the new trial insulated Chicoine from any damages caused by the untimely filing. *Chicoine*, 122 Idaho at 487, 835 P.2d at 1298. Essentially, no injury had been caused by Chicoine's lawyer's malpractice so long as Chicoine was assured of a new trial, and therefore he could not yet have suffered any damages as a result of the negligence. Had the grant of the motion for new trial never been reversed, Chicoine would not have been able to bring his legal malpractice claim. In *Buxton*, the Court held that "the existence or effect

---

b. For physical, mental and emotional injuries suffered by Plaintiff Patrick Stuard in the past, and for those damages he will suffer in the future, in an amount to be proven at trial;

c. For past and future loss of earning capacity, income and/or expenses associated with the surgeries, disabilities and impairments caused by Defendant's wrongful conduct;

d. With regard to Plaintiff Jeanne Stuard, for the loss of the services, comfort, care, society and companionship of her husband, Plaintiff Patrick Stuard; and

e. For such other damages as may be given as under all the circumstances of the case as may be just.

of any alleged negligence on the part of the City's Attorneys regarding their legal advice and strategy depended upon the outcome of the litigation against the City" that was brought as a result of that bad advice. 146 Idaho at 663, 201 P.3d at 636. The Court reasoned that "it would be difficult to conceive of a situation in which the City could have recovered on a malpractice claim against its Attorneys had the City prevailed in the litigation." *Id.* at 662, 201 P.3d at 635. Basically, should the City have won those lawsuits it would have had no injury as a result of the bad legal advice under which to bring a negligence claim. The case at hand is distinguishable from both of those cases because an injury occurred immediately as a result of the medical malpractice of Dr. Jorgenson: the opening of the body by incision, the removal of otherwise healthy tissue and the installation of hardware at the wrong level. Stuard had a medical-malpractice claim for these injuries and the damage from them as soon as the negligent surgery occurred. His claim thus accrued at that time.

**B.  The Locking Plate and Other Hardware Installed During Surgery Do Not Constitute a Foreign Object Under I.C. § 5-219 Because They Were Intentionally Left in Stuard's Body.**

Stuard argues that the locking plate and other hardware installed into Stuard's spine at the wrong level constituted a "foreign object" under I.C. § 5-219. The foreign object exception contained within I.C. § 5-219 provides that the discovery rule will apply to the "placement and inadvertent, accidental or unintentional leaving of any foreign object in the body of any person." I.C. § 5-219(4). Under the discovery rule, the statute of limitations would only accrue once "the injured party knows or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of." *Id.*

The locking plate and other hardware are not a foreign object because they were intentionally left in Stuard's body. In the Court of Appeals' decision in *Ogle v. De Sano*, 107 Idaho 872, 693 P.2d 1074 (Ct. App. 1984), the court found that an I.U.D.[8] was not a foreign object because it was "intentionally placed in a woman's body with her consent, . . . has a continuing medical function, and . . . will be removed when its function is no longer needed." 107 Idaho at 875, 693 P.2d at 1077. Therefore, the court reasoned, I.C. § 5-219(4) excludes from the definition of foreign objects "such devices deliberately placed in the body, with the patient's knowledge and consent, which are within the body intentionally." *Id.* Idaho Code § 5-219, by

---

[8] I.U.D. stands for Intrauterine Device, and is "a device inserted and left in the uterus to prevent effective conception." *Merriam-Webster's Collegiate Dictionary* 657 (11th ed. 2007).

its very language, contemplates that the "leaving" of the object in the body must be "inadvertent, accidental or unintentional." I.C. § 5-219. This Court accordingly adopts the Court of Appeals' holding in *Ogle* that a medical device which is placed in the body intentionally for the purpose of medical treatment is not a "foreign object" under the statute. *Accord Hall v. Ervin*, 642 S.W.2d 724, 726–28 (Tenn. 1982) (exception does not apply to an object which had been deliberately implanted in the body); *Hills v. Aronsohn*, 199 Cal. Rptr. 816, 823–24 (Cal. Ct. App. 1984) (substance or object that is intentionally introduced into the body for therapeutic purposes is not a "foreign object"); *LaBarbera v. N.Y. Eye & Ear Infirmary*, 691 N.E.2d 617, 620–21 (N.Y. 1998) (stent placed in body for medical purposes not a "foreign object"); *Goldsmith v. Howmedica, Inc.*, 491 N.E.2d 1097, 1098–99 (N.Y. 1986) (prosthetic device implanted in patient's hip not a "foreign object"); 61 Am. Jur. 2d *Physicians, Surgeons, Etc.* § 302 (2002).

This Court's prior decisions regarding the "foreign object" exception also support the view that the object must be negligently *left* in order for the exception to apply. *See Billings v. Sisters of Mercy*, 86 Idaho 485, 497–98, 389 P.2d 224, 232 (1964) (gauze sponge inserted during surgery negligently left there); *Stoner v. Carr*, 97 Idaho 641, 642–44, 550 P.2d 259, 260–62 (1976) (surgical needle negligently left in patient's abdomen); *Reis v. Cox*, 104 Idaho 434, 438–40, 660 P.2d 46, 50–52 (1982) (fragment from a medical drain negligently left in body). The Court of Appeals noted in *Ogle* that in each of these instances, the "foreign object" was "left in the patient's body from previous operations." *Ogle*, 107 Idaho at 875, 693 P.2d at 1077.

Stuard argues that because the locking plate and other hardware were installed as a result of Dr. Jorgenson's negligence, they were "inadvertently left." However, the statute and case law cited require that the inadvertence be in the *leaving* of the foreign object, not in the performance of the surgery. The statute already applies to malpractice cases, and thus every defendant under the statute will have already acted negligently, and the language of inadvertence in the foreign object exception in the statute would simply be redundant under Stuard's view. Dr. Jorgenson intentionally placed the locked plate and other hardware into Stuard's body and intentionally left it in his body. The fact that he acted negligently in placing them at the wrong level does not trigger the foreign object exception under the plain language of the statute.

Further, the hardware was placed into Stuard's body with his consent and for a medical purpose. While the hardware was not intended to be installed at the wrong level, it was intended to serve a medical purpose to fuse the spine together. Stuard has not included a copy of the

informed-consent form in the record, and therefore we cannot speculate as to whether it contained limiting language as to his consent. He admits he consented to the surgery and to the placement of the hardware within his body for the medical purpose of fusing his spine and treating his herniated disk, albeit not at the wrong level. Therefore, this Court holds that the foreign object exception does not apply here.

Neither party requests attorney fees on appeal and accordingly none will be awarded.

## VI. CONCLUSION

This Court affirms the district court's grant of summary judgment. Stuard's malpractice action accrued at the time of the surgery because some damage was objectively ascertainable at that time. Further, the "foreign object" exception does not apply because the locking plate and other hardware were intentionally left within the body for the purpose of medical treatment. No attorney fees are awarded on appeal. Costs to Dr. Jorgenson.

Chief Justice EISMANN and Justice HORTON **CONCUR.**

J. JONES, J. concurring in part and dissenting in part.

I concur with Part V.B of the Court's opinion regarding the "foreign object" issue but dissent with regard to Part V.A regarding the "some damage" issue. There are simply too many unanswered questions to make the determination that some damage was objectively ascertainable on July 15, 2004, when Dr. Jorgenson operated on Mr. Stuard (the "first operation").

Interestingly enough, both parties claim that Mr. Stuard sustained injury as a result of the first operation. Mr. Stuard asserts injury to support his claim for medical malpractice. Dr. Jorgenson asserts injury to support his statute of limitations defense. The parties dispute, however, whether the injury was objectively ascertainable as of the date of the first operation. Perhaps we should take the parties' claims of injury at face value and ignore contrary inferences that starkly appear from the record. Unfortunately, neither party has submitted competent sworn testimony to support their respective positions. Therefore, the Court is left with a rather skimpy record upon which to make its decision.

Based on the slender record before the Court, there does appear to be a genuine issue of material fact as to whether Mr. Stuard suffered an injury at the time of the first operation. Mr. Stuard did not go to Dr. Jorgenson simply to have an operation at the T6-7 level of his spine. Rather, he went to Dr. Jorgenson because he was experiencing pain. The operation performed by Dr. Jorgenson, even though it may have been performed at the wrong level, appears to have

11

alleviated that pain. Therefore, without competent evidence to so indicate, it cannot be conclusively assumed for the purposes of summary judgment that Mr. Stuard suffered an injury at the time of the operation. Nothing in Dr. Jorgenson's deposition testimony explains what damage resulted from the operation. He does not assert that another operation was necessitated by virtue of what he did or did not do in the first operation. At the deposition he testified "As a consequence [of the operation], [Mr. Stuard] still had the same pathology and same herniation at the T6-7 level as he had before. And that's what I believe is causing his current symptoms." We do not know what Dr. Jorgenson means by "current symptoms" since his deposition was taken on September 19, 2008, and Mr. Stuard was operated upon at T6-7 by Dr. Tyler Frizzell on March 21, 2007. We do know that Mr. Stuard was in the same condition with respect to T6-7 after the first operation as he was before that operation. There is no competent evidence in the record to establish that Mr. Stuard suffered an injury by leaving T6-7 in the same condition it was in prior to the first operation.

Neither party has addressed the issue of how Dr. Jorgenson could have performed the first operation without concluding that something was amiss. In other words, if the MRI taken prior to the operation disclosed a disk protrusion at T6-7, wouldn't Dr. Jorgenson have been somewhat surprised to find no disk damage when he was actually performing the operation? Could he have had no suspicion at that time that he may have blundered? Of interest is the fact that Dr. Jorgenson's operative report, detailing what occurred during the operation, indicates that after the disk was removed, "a moderate sized fragment of disk was encountered and removed . . . . . There was additional calcified disk in this area. This was slowly removed . . . until it appeared to be flat."[9] The fact that Dr. Jorgenson actually removed a piece of fragmented disk and some calcified disk from the T5-6 level, even though it was not the intended level, could very well be the reason that Mr. Stuard's pain was alleviated by the operation. It would be reasonable to infer on summary judgment that Dr. Jorgenson actually performed a service to Mr. Stuard by repairing the disk at T5-6, even though by accident. It is difficult to infer that Mr. Stuard suffered injury from the operation simply because the operation was done on the wrong area when it did, in fact, relieve his symptoms. Nothing in the record indicates that Mr. Stuard would have needed

---

[9] During oral argument before this Court, Dr. Jorgenson's counsel was asked why Mr. Stuard's pain was relieved, even though the operation was performed at the wrong level. Counsel indicated that it was either because Mr. Stuard had not really been suffering pain, implying that he was malingering, or that the pain was alleviated by the placebo effect. He could offer no other reason. Apparently, it did not occur to him that the first operation resulted in the removal of disk material that may have been causing the pain from which Mr. Stuard was seeking relief.

additional medical treatment for his initial pain symptoms had he not sustained a second injury that resulted in the discovery that the first operation was apparently performed in the wrong place.

Furthermore, the only evidence in the record regarding the injury Mr. Stuard allegedly suffered on the date of the first operation is the self-interested and conclusory testimony of Dr. Jorgenson himself. In his affidavit, Dr. Jorgenson states that the operation resulted in objectively ascertainable injury without explaining exactly what that injury might be. The sum total of affidavit testimony on the issue reads, "The operation . . . caused objectively ascertainable injuries and some damages . . ." The affidavit preparer was obviously familiar with the language of the medical malpractice cases, if not the rule requiring facts, instead of conclusory statements, in a summary judgment affidavit. I.R.C.P. 56(e); *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002) (In a medical malpractice case, statements that are conclusory do not satisfy either the requirement of admissibility or competency under Rule 56(e)). Dr. Jorgenson goes on to state that his operative report sets forth the injuries and damages caused by operating at the wrong spinal level. However, nothing in the operative report explains what injury occurred by virtue of the operation. In fact, as mentioned above, the operative report indicates that Dr. Jorgenson took steps during the operation that could have resulted in Mr. Stuard's pain being alleviated.

Dr. Jorgenson's argument that there may have been some healthy bone and flesh removed during the operation does not establish that there was an injury. As a matter of fact, there is no competent evidence in the record to support this contention. Dr. Jorgenson gave no testimony in this regard. He merely states that the "injuries and damages" are set forth in his operative report, leaving it to the Court to ponder the report and speculate what might or might not have been injurious. Indeed, there is no testimony in the record explaining how what was done or not done in the first operation might have been injurious or the cause of damage to Mr. Stuard. Neither is there any testimony indicating that the second operation by Dr. Frizzell was necessitated as a result of the first operation. The only document in the record indicating what occurred at the second operation is Dr. Frizzell's operative report which is attached to the affidavit of Mr. Stuard's attorney. The report was not prepared by the attorney, it makes no mention of the first operation and, without foundation or authentication, the report is mere inadmissible hearsay. For all we know from the record, the second operation was necessitated by Mr. Stuard's second

injury, which occurred on August 31, 2006, and had nothing to do with what did or did not occur in the first operation.

While Mr. Stuard would have to prove an injury resulted from Dr. Jorgenson's negligence, if this case were to be remanded for trial,[10] there is a genuine issue of material fact regarding whether he suffered an injury at the time of the first operation, making summary judgment inappropriate on statute of limitations grounds at this stage of the proceedings.

Even if Mr. Stuard can be said to have sustained an injury at the time of the first operation, there is no credible evidence in the record suggesting that such injury was objectively ascertainable at that time. Dr. Jorgenson's testimony that the erroneous locale of the operation could have been objectively ascertained by an MRI taken shortly after the operation is of questionable credibility because of the fact that Dr. Jorgenson himself could not ascertain the error the first two times he reviewed the MRI taken on September 20, 2006. "Summary judgment is not proper where the depositions and affidavits raise any question as to the credibility of witnesses," and where the testimony of the witness is material. *J.R. Simplot Co. v. Bosen*, 144 Idaho 611, 615, 167 P.3d 748, 752 (2006) (quoting *Athay v. Stacey*, 142 Idaho 360, 368, 128 P.3d 897, 905 (2005)). Issues that turn on credibility should be reserved for determination by the trier of fact.

Specifically, Dr. Jorgenson testified during his deposition that he reviewed the September 20 MRI online with Mr. Stuard during his visit on September 28, 2006. When Dr. Jorgenson was asked whether he "note[d], then, on September 28 that [his] surgery had been at the wrong level," Dr. Jorgenson answered "no." When Dr. Jorgenson's counsel was asked during oral argument before this Court why Dr. Jorgenson could not tell from the MRI that the operation had been performed at the wrong level, counsel conceded he could provide no explanation. Dr. Jorgenson met with Mr. Stuard again on October 23, 2006. Dr. Jorgenson's notes from that visit state, "[r]eview of [Mr. Stuard's] MRI does document a T6-7 disk protrusion as well as T7-8 foraminal disk protrusion off to the left." These notes indicate that the September 20 MRI results showed a protrusion at the site Dr. Jorgenson believed he had operated on and fixed.[11] However,

---

[10] Presumably, he would have to either show that he suffered injury by virtue of Dr. Jorgenson's failure to remedy the alleged problem at T6-7 or that he suffered injury at T5-6 as a result of the operation performed at that level. Further, he would need to establish that the injury was objectively ascertainable within the limitations period.

[11] Dr. Jorgenson originally planned to operate on the T6-7 level to repair Mr. Stuard's herniated disk, or disk protrusion, but he erroneously operated on the T5-6 level. As such, if the MRI truly did show, as Dr. Jorgenson's notes indicate, that there was still a protrusion at the T6-7 level, Dr. Jorgenson would have been on notice that there

when asked whether he realized during the second review of the MRI that his surgical procedure was performed at the wrong level, Dr. Jorgenson answered "no." When confronted with this inconsistency at his deposition, Dr. Jorgenson stated, "[i]n reviewing that note, I believe that's a typographical error. I believe what it should say is he had a T6-7 fusion. . . . Because I didn't discuss the level of the fusion." Therefore, although Dr. Jorgenson met with Mr. Stuard three times[12] after the September 20 MRI was taken, and reviewed the MRI at least twice, he testified he was still unable to determine that he had operated on the wrong level of Mr. Stuard's spine.[13] According to Dr. Jorgenson, it was not until a nurse case manager, who had reviewed the radiologist's report with regard to the MRI,[14] contacted him regarding the discrepancy in the levels that he was finally aware that he may have operated on the wrong level. Dr. Jorgenson then ordered another MRI, which he testified that he reviewed and was able to finally determine that he operated on the T5-6 level instead of the T6-7 level.

Dr. Jorgenson's testimony that Mr. Stuard's injury was objectively ascertainable from reading an MRI is certainly of questionable credibility because Dr. Jorgenson himself failed to ascertain the mistake at least twice from reading the September 20 MRI. The infirmities in Dr. Jorgenson's testimony lend themselves to the drawing of one of three reasonable inferences: (1) Dr. Jorgenson lacked adequate foundation to testify as to whether the injury was objectively ascertainable and his affidavit and deposition testimony should have been disregarded,[15] (2) he was qualified to make such a determination, but the injury was not truly objectively

---

was still some herniation at the T6-7 level and the operation had actually been done at the T5-6 level. Curiously, Dr. Jorgenson claims this was a typographical error.

[12] Dr. Jorgenson also met with Mr. Stuard on October 9, 2006. Neither the deposition testimony nor Dr. Jorgenson's notes indicate whether the MRI results were reviewed again during this visit, but Dr. Jorgenson testified that as of the October 9 visit, he was still unaware that the surgery had been performed at the wrong level.

[13] It is also worth noting that, according to Dr. Jorgenson's testimony, the several x-rays taken after the surgery showed only a portion of Mr. Stuard's spine and, therefore, "he did not have the ability to count levels and to accurately assess the actual levels where the hardware was placed." However, Dr. Jorgenson's notes dated February 25, 2005, state "Plain films taken in our office today show fusion at T6-7 level with an anterior plate." This statement in Dr. Jorgenson's notes, indicating that the level in which the fusion was located was discernible from the plain films, is in apparent conflict with his testimony that the levels could not be discerned from plain x-rays. This further demonstrates concern about Dr. Jorgenson's credibility.

[14] Dr. Jorgenson testified that although he reviews his own MRIs, he also uses a radiologist's interpretation of the MRI results. The record indicates that both Dr. Jorgenson and the nurse case manager reviewed the radiologist's report regarding the September 20 MRI, but for some reason that report is not in the record, nor was any testimony from the nurse case manager.

[15] Idaho Rule of Civil Procedure 56(e) provides that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify about the matters stated therein." If two reviews of an MRI were not sufficient for Dr. Jorgenson to identify the error in the operation, even though a nurse reviewing the radiologist's report of the same images was able to discern the mistake, then Dr. Jorgenson was seemingly not competent to testify on the matter.

ascertainable; or (3) the injury was objectively ascertainable, but Dr. Jorgenson concealed the injury until found out by the nurse case manager.[16] Regardless of which of the three is true, summary judgment is not appropriate because the inconsistencies in Dr. Jorgenson's deposition testimony and affidavit raise a question as to his credibility. Dr. Jorgenson is certainly a material witness because his affidavit and deposition testimony are the only evidence in the record addressing whether the erroneous locale of the operation was objectively ascertainable.[17] Consequently, viewing the evidence in the light most favorable to Mr. Stuard, the evidence is insufficient to support a grant of summary judgment in this case.

In my mind, there is an additional reason to decline affirmance of the summary judgment and that relates to the "some damage" rule that has evolved in medical malpractice cases. The some damage rule in medical malpractice cases is not consistent with the some damage rule in legal malpractice cases and the legal malpractice standard simply makes more sense. Some damage in the legal malpractice sense means ascertainable monetary damage resulting from injurious conduct on the part of the professional. In medical malpractice cases it has been interpreted to mean anything from some injury to the body, without regard to whether the same may be compensable in a damage suit, all the way to actual out-of-pocket monetary damages. Application of the some damage rule in medical malpractice cases is in stark contrast to the application of the some damage requirement in legal malpractice cases. There does not seem to be any logical reason for treating the some damage requirement differently in medical malpractice cases than in legal malpractice cases, which require objective *proof* supporting the existence of some compensable damage. For example, in *Chicoine v. Bignall*, an attorney defended Chicoine in a lawsuit that ultimately resulted in a jury verdict for damages against Chicoine. 122 Idaho 482, 482, 835 P.2d 1293, 1293 (1992). The attorney timely filed a motion for a judgment notwithstanding the verdict (J.N.O.V.), and later filed a motion for a new trial. *Id.*

---

[16] This latter inference may be supported, to an extent, by the fact that Dr. Jorgenson failed to indicate in his report of the operation his failure to find a disk protrusion at the level he was operating upon when he was actually inside of Mr. Stuard's back. Curiously, Mr. Stuard has not claimed that Dr. Jorgenson knowingly concealed the alleged mistake, which might have been a more convenient way to avoid the statute of limitations problem.

[17] Of interest is the fact that Mr. Stuard's attorneys filed a Plaintiffs' Expert Witness Disclosures on March 25, 2009, approximately a month and a half prior to the hearing on the motion for summary judgment, wherein they disclosed that their medical expert, Dr. Frizzell, who performed the second operation, was expected to testify that Mr. Stuard's "damages and harm . . . did not become objectively ascertainable . . . until after he suffered a second on-the-job injury on or about August 31, 2006." This statement, of course, is not competent evidence and, indeed, was not offered in opposition to the motion for summary judgment. It is not clear why an affidavit from the expert was not obtained and produced in opposition to the summary judgment motion.

The district court granted the J.N.O.V. motion, but this Court reversed on appeal. *Id.* On remand, the district court considered and granted the motion for a new trial. *Id.* On appeal for the second time, this Court reversed the grant of the new trial on the ground that Chicoine's attorney had failed to timely file the motion. *Id.* Several months later, Chicoine brought an action for malpractice against his attorney. *Id.* Even though it was clear Chicoine's attorney had been negligent and that Chicoine had incurred attorney fees in defending the action after his attorney's negligent act of failing to timely file the motion for a new trial, this Court held "there was no objective proof of some damage to Chicoine until this Court reversed the order granting a new trial . . . ." *Id.* at 487, 835 P.2d at 1298. The Court noted that "[u]ntil then, the order granting the new trial, in effect, protected Chicoine from any damage. So long as the trial court's order stood, Chicoine was entitled to a new trial, despite the untimeliness of the motion." *Id.* In other words, until a claimant has a definitive basis for seeking monetary damages, there is no accrual of the legal malpractice claim.

Similarly, in *City of McCall v. Buxton*, the City of McCall entered into a construction contract with St. Clair. 146 Idaho 656, 657, 201 P.3d 629, 630 (2009). St. Clair encountered various delays during the course of the construction, and the City concluded St. Clair was not in compliance with the terms of the contract. *Id.* at 658, 201 P.3d at 631. On the alleged advice of its attorneys, the City terminated its contract with St. Clair. *Id.* Wausau, which had issued a performance bond on behalf of St. Clair, hired a replacement contractor to complete the work pursuant to the contract. *Id.* The City concluded that the replacement contractor's work was deficient and, on the alleged advice of its attorneys, the City decided to withhold payment to Wausau for its replacement contractor and hire another contractor. *Id.* In December of 2001, Wausau sued the City for wrongfully withholding payment. *Id.* In January of 2002, the City began incurring expenses as a result of defending the Wausau action. *Id.* St. Clair later filed a cross-claim against the City. *Id.* After a trial on the merits of St. Clair's and Wausau's claims, a jury awarded damages against the City. *Id.*

The City subsequently brought a malpractice action against its attorneys alleging, in part, that the attorneys negligently advised the City to terminate its contract with St. Clair and withhold payment from Wausau. *Id.* In reversing the district court's conclusion that these claims were barred by the statute of limitations, this Court held that "under the circumstances of this case, the existence or effect of any alleged negligence on the part of the City's Attorneys

17

regarding their legal advice and strategy depended upon the outcome of the litigation against the City by Wausau and St. Clair. There would not be objective proof of actual damage until that occurred." *Id.* at 663, 201 P.3d at 636. This was true even though the City was already well aware of conduct giving rise to a claim for professional malpractice and had already been incurring costs associated with defending the actions against it.

These cases demonstrate that in the context of legal malpractice, the Court requires some actual, objective proof of monetary damage before the statute of limitations period is commenced. In *Chicoine*, the act of filing the late motion for a new trial was itself wrong. However, there was no objective proof that there was any monetary damage until the appellate court reversed the district court's grant of the new trial. In other words, the adverse court ruling against Chicoine demonstrated that some damage had occurred. In *Buxton*, even though it clearly appeared that the Buxton firm may have breached its duty to the City and even though the City was accruing costs associated with defending the resultant lawsuit, this Court was not willing to say some damage had occurred until a verdict was entered against the City. Until there was an actual finding that the City was monetarily liable to Wausau and St. Clair, there was only a potential risk that the attorney's actions would result in any damage to the City. Similarly in this case, there has been no credible testimony from a qualified doctor indicating that Mr. Stuard was damaged and that some remedial measures were necessary to repair that damage. Based on the lack of credible medical testimony we are left to speculate as to whether and when Mr. Stuard may have sustained a compensable injury. Therefore, I would hold that, pursuant to this Court's holdings in *Chicoine* and *Buxton*, there must be some credible medical evidence demonstrating that some damage of a monetary nature—in this case, an injury to Mr. Stuard's body that required the outlay of monetary resources to repair—occurred before I would find that the statute of limitations begins to run in a medical malpractice action.

This principle regarding some damage was applied by this Court in *Hawley v. Green*, 117 Idaho 498, 788 P.2d 1321 (1990). In that case, Hawley received three chest x-rays between 1979 and 1983, each of which was reviewed by a different doctor. *Id.* at 499, 788 P.2d at 1322. Even though the x-rays revealed that Hawley had a tumor in her lower neck and chest area, each of the three doctors failed to diagnose it. *Id.* at 500, 788 P.2d at 1323. Hawley did not learn of the tumor until several years later when a different doctor diagnosed it after reviewing an x-ray of

18

her chest. *Id.* After the tumor was surgically removed, Hawley learned the tumor was malignant. *Id.*

Hawley then filed a medical malpractice action against the doctors for negligently failing to diagnose the tumor. *Id.* The district court found that "since Hawley's tumor was visible on the X-rays from 1979 through 1983, there was objectively ascertainable damage at that time, and the statute began to run no later than 1983 . . . ." *Id.* On appeal to this Court, Hawley argued that because there was no evidence presented before the district court regarding whether the tumor was in fact malignant when the doctors failed to diagnose it, there was a genuine issue of material fact as to whether damage occurred at that time. *Id.* at 503, 788 P.2d at 1326. This Court found that the statute of limitations had not expired, noting that,

> the record in the present case does not contain any evidence to show that any damage was occurring at the time the defendants failed to diagnose Hawley's tumor. The only facts that are established and uncontroverted in this record are that the tumor was evident on the X-rays taken between 1979 and 1983. There is no evidence in the record one way or another concerning whether during 1979-83 the tumor was progressive, malignant, harmful or in any manner dangerous at this point in time. While we might speculate, as the district court apparently did, that the tumor was progressive, malignant, or otherwise dangerous, the record does not establish that as an uncontradicted factual matter.

*Id.* at 504, 788 P.2d at 1327.

This case is similar to *Hawley* because, just as there was no evidence establishing that the mere existence of the tumor was harmful to Hawley, there is no evidence here indicating that the mere fact that the surgery was done at the wrong level was harmful to Mr. Stuard. In fact, even though Dr. Jorgenson operated on the wrong level of Mr. Stuard's spine, Mr. Stuard's pain was alleviated and his symptoms were cured. Although this Court might speculate that Dr. Jorgenson's mistake of operating at the wrong level caused him some harm, there is no evidence in the record to establish that determination as an uncontradicted fact. For purposes of summary judgment, we are required to draw all reasonable inferences in favor of Mr. Stuard and, therefore, I cannot say there is no genuine issue of material fact as to whether Mr. Stuard suffered some damage.

I would vacate the district court's grant of summary judgment in favor of Dr. Jorgenson and remand for determination of the unanswered questions that manifest themselves from the skimpy record before the Court.

Justice BURDICK CONCURS.